IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA18-651

Filed: 19 March 2019

Johnston County, No. 17 CVS 2177

PATRICIA HAGER, Executrix of the ESTATE OF ALBERT HOFFMASTER, Plaintiff,

v.

SMITHFIELD EAST HEALTH HOLDINGS, LLC, d/b/a GABRIEL MANOR ASSISTED LIVING CENTER, SMITHFIELD OPERATIONS, LLC, SABER HEALTHCARE HOLDINGS, LLC, SABER HEALTHCARE GROUP, LLC, SHERRY TABOR, Defendants.

Appeal by Defendants from order entered 6 February 2018 by Judge Thomas H. Lock in Johnston County Superior Court. Heard in the Court of Appeals 15 January 2019.

> *Gugenheim Law Offices, P.C., by Stephen J. Gugenheim, for Plaintiff-Appellee.*
>
> *Cranfill Sumner & Hartzog LLP, by Carl Newman and Katherine Hilkey-Boyatt, for Defendants-Appellants.*

INMAN, Judge.

A daughter's difficult decision to admit her father, who suffered from dementia, to a long-term assisted living and memory care facility as his attorney-in-fact did not create a fiduciary duty between the father and the facility.

This case arises out of a medical malpractice, negligence, and wrongful death action brought by the plaintiff Patricia Hager ("Ms. Hager"), daughter to and

executrix of the Estate of Albert Hoffmaster ("Mr. Hoffmaster") against defendants Smithfield East Health Holdings, LLC d/b/a Gabriel Manor Assisted Living Center ("Smithfield East"), Smithfield Operations, LLC ("Smithfield Operations"), Saber Healthcare Holdings, LLC ("Saber Holdings"), Saber Healthcare Group, LLC ("Saber Healthcare"), and Sherry Tabor ("Tabor," collectively with Smithfield East, Smithfield Operations, Saber Holdings, and Saber Healthcare as "Defendants"). Defendants appeal the trial court's order denying their motion to compel arbitration, which found both the existence of a fiduciary relationship between Smithfield East and Mr. Hoffmaster and a breach of the corresponding fiduciary duty because Smithfield East failed to fully disclose the significance of an arbitration agreement presented to and signed by Ms. Hager as attorney-in-fact for Mr. Hoffmaster. After careful review of the record and applicable law, we reverse the order of the trial court in part and remand for entry of an order compelling arbitration of the claims against Smithfield East. We affirm the trial court's denial of the motion to compel arbitration by all other defendants except Smithfield Operations, and remand for the trial court to make findings and conclusions regarding that defendant.

## I. **FACTUAL AND PROCEDURAL HISTORY**

The record tends to show the following:

From September 2014 until late October 2015, Ms. Hager cared for her father, Mr. Hoffmaster, who suffered from dementia, in her home in Johnston County. On

the morning of 27 October 2015, Ms. Hager found Mr. Hoffmaster in the bathroom after he had urinated on the carpet and disassembled a lamp in his bedroom. He insisted that he had called for Ms. Hager all night, though she had checked on him frequently throughout that time. Ms. Hager immediately decided she needed to admit Mr. Hoffmaster to a long-term care facility; she later explained in an affidavit that she "did not feel as though [she] could violate his dignity by bathing and toileting him" and "had told [Mr. Hoffmaster] that when the day came that [she] could not care for him with bathing and personal care [she] would have to make that decision."

Ms. Hager called her chiropractor's office for a recommendation to a nursing home facility close to her home. Ms. Hager's chiropractor referred her to Gabriel Manor, a facility where the chiropractor provided treatment to some residents. Ms. Hager telephoned Gabriel Manor and asked if there was a room available in the memory ward, which serves patients with dementia and other cognitive disabilities. Ms. Hager stated that she needed an immediate placement for her father; in response, the representative from Gabriel Manor offered Ms. Hager the opportunity to bring Mr. Hoffmaster by that day, tour the facility, and have lunch. Though she did not have the heart to tell her father, Ms. Hager had already resolved to admit him to Gabriel Manor before they left their home. She also called a family friend, Esta List ("Ms. List"), about the morning's events. Ms. List accompanied Ms. Hager and Mr. Hoffmaster to Gabriel Manor later that morning.

After arriving at Gabriel Manor, the three toured the facility and ate lunch in its dining room. Ms. Hager "decided right then that she was going to admit her father to Gabriel Manor that day" and informed facility staff. Ms. Hager entered a conference room with a Gabriel Manor representative where, as part of the intake process, she was presented with multiple documents to sign as Mr. Hoffmaster's attorney-in-fact. Among the documents she signed were an Assisted Living Residency Agreement, Patient Information Forms for Doctors Making Housecalls, and the Resident and Facility Arbitration Agreement ("Arbitration Agreement"). In completing the forms, Ms. Hager provided confidential information regarding Mr. Hoffmaster, including his social security number, contact information for his physicians, a list of medications, his Alzheimer's diagnosis, health insurance cards and policy numbers, credit card numbers, and signed authorizations to release Mr. Hoffmaster's medical records to Doctors Making Housecalls.

Of the several documents presented to Ms. Hager, no particular attention was directed towards the Arbitration Agreement. The representative did not discuss the Arbitration Agreement with Ms. Hager, and she did not ask any questions concerning it; indeed, Ms. Hager signed the document without ever reading it.

The Arbitration Agreement itself, which by its terms is governed by the Federal Arbitration Act ("FAA"), begins with the text "**NOT A CONDITION OF ADMISSION – READ CAREFULLY**" in bolded, all capital letters. It also includes,

in bolded typeface, provisions: (1) allowing Ms. Hager to cancel the agreement for any reason within 60 days of signing it; (2) allowing Ms. Hager the opportunity to read, ask questions, and propose revisions to the document prior to signing; and (3) informing Ms. Hager of her right to retain counsel to review the agreement and advising her to do so. The final provision of the agreement, in bolded and italicized capital letters, states that "***THE PARTIES UNDERSTAND THAT BY ENTERING INTO THIS AGREEMENT, THE PARTIES ARE GIVING UP THEIR CONSTITUTIONAL RIGHT TO HAVE ANY CLAIM DECIDED IN A COURT OF LAW BEFORE A JUDGE AND A JURY, AS WELL AS ANY APPEAL FROM A DECISION OR AWARD OF DAMAGES***."

After signing the documents presented to her, Ms. Hager was provided with copies of each in a folder. She took them home and never looked at them again, and at no point exercised her right to cancel the Arbitration Agreement. Ms. Hager discarded the documents after Mr. Hoffmaster passed away on 25 February 2016, four months after his admission to Gabriel Manor.

Ms. Hager filed suit on behalf of her father's estate against Defendants, alleging claims of negligence, medical malpractice, and wrongful death in the passing of her father while in Defendants' care at Gabriel Manor. The complaint further alleged that each of the Defendants "was the agent, partner, joint venturer, representative, and/or employee of the remaining Defendants, and was acting within

the course and scope of such agency, partnership, joint venture, and/or employment." Defendants filed a combined answer, motion to dismiss, and motion to compel arbitration, admitting that Smithfield East owns Gabriel Manor but denying any other alleged connection between the facility and the remaining Defendants. Saber Healthcare's general counsel filed an affidavit concurrently with the Defendants' pleading, stating that Saber Healthcare and Saber Holdings are not licensed in North Carolina and have "no involvement in the management of staff, the provision of care, control over the day to day operations, or oversight of the operation or management of Smithfield East[.]"

The motion to compel arbitration came on for hearing on 8 January 2018. In a written response to the motion and during the hearing, counsel for Ms. Hager asserted that: (1) there was no evidence that any of the Defendants was a party to the Arbitration Agreement and therefore they lacked standing to compel arbitration; and (2) Defendants, if parties to the Arbitration Agreement, owed and breached a fiduciary duty to Mr. Hoffmaster in failing to fully disclose the terms and consequences of the Arbitration Agreement prior to obtaining Ms. Hager's signature. The trial court agreed with Ms. Hager, finding in part in a written order filed 6 February 2018 that Smithfield East was the only defendant party to the Arbitration Agreement and concluding that it breached a fiduciary duty owed to Mr. Hoffmaster in "requesting that Ms. Hager sign a document with substantial legal ramifications

and which they believed to be of benefit to themselves without full disclosure to Mr. Hoffmaster" through Ms. Hager as his attorney-in-fact. The trial court's order also made factual findings, consistent with the history recited above, to support its ruling. Defendants timely appealed.

## II. ANALYSIS

Defendant's appeal presents three principal questions: (1) whether Smithfield East owed a fiduciary duty to Mr. Hoffmaster through Ms. Hager; (2) whether that duty, if it existed, was breached by Smithfield East's failure to press upon Ms. Hager the significance and ramifications of the Arbitration Agreement prior to her signing it; and (3) whether all Defendants have standing to compel arbitration. In their briefs, the parties seek to resolve the first question by either distinguishing or analogizing our Supreme Court's *de facto* fiduciary duty analysis undertaken in *King v. Bryant*, 369 N.C. 451, 795 S.E.2d 340 (2017). In oral argument, counsel for Ms. Hager proposed a new *de jure* rule holding that a fiduciary relationship always exists between licensed long-term care facilities with memory care wards and their residents. Because we decline to create a new *de jure* fiduciary relationship while distinguishing *King*, we hold that the trial court erred in concluding a fiduciary relationship existed. We also hold that only Smithfield East has satisfied its evidentiary burden establishing standing to compel arbitration.

*A. Appellate Jurisdiction*

Ordinarily, interlocutory orders are not immediately appealable. *Griessel v. Temas Eye Care Center, P.C.*, 199 N.C. App. 314, 315, 681 S.E.2d 446, 447 (2009). An immediate appeal, however, lies from an interlocutory order where the ruling below affects a substantial right. N.C. Gen. Stat. § 1-277(a) (2017). A denial of a motion to compel arbitration falls into this latter category, and we therefore possess jurisdiction to hear Defendants' appeal. *Griessel*, 199 N.C. App. at 316-17, 681 S.E.2d at 448.

B. *Standards of Review*

On review of an order containing factual findings, unchallenged findings of fact are binding on appeal while conclusions of law are reviewable *de novo*. *King*, 369 N.C. at 463, 795 S.E.2d at 348. Legal conclusions in an order imposing a fiduciary relationship, including whether the facts establish a fiduciary relationship and whether any fiduciary duty was breached, are reviewed *de novo*. *Id.* Similarly, we apply the *de novo* standard to the denial of a motion to compel arbitration and its underlying conclusions of law concerning issues of contract interpretation and whether the dispute is subject to arbitration. *Creed v. Smith*, 222 N.C. App. 330, 333, 732 S.E.2d 162, 164 (2012).

C. *Fiduciary Relationships*

North Carolina recognizes two types of fiduciary relationships: *de jure*, or those imposed by operation of law, and *de facto*, or those arising from the particular facts and circumstances constituting and surrounding the relationship. *Lockerman*

*v. South River Electric Membership Corp.*, ___ N.C. App. ___, ___, 794 S.E.2d 346, 351 (2016). As our Supreme Court has recently cautioned, "[t]he list of relationships that we have held to be fiduciary in their very nature is a limited one, and we do not add to it lightly." *CommScope Credit Union v. Butler & Burke, LLP*, 369 N.C. 48, 52, 790 S.E.2d 657, 660 (2016) (citations omitted). That list has, thus far, been limited to legal relationships, including attorney and client, physician and patient, spouses, business partners, and guardian and ward. *See Abbitt v. Gregory*, 201 N.C. 577, 598, 160 S.E. 896, 906 (1931), *Dallaire v. Bank of America, N.A.*, 367 N.C. 363, 367, 760 S.E.2d 263, 266 (2014), *and King*, 369 N.C. at 464, 795 S.E.2d at 349 (listing the various kinds of *de jure* fiduciary relationships).

*De facto* relationships are less immediately identifiable, as "[c]ourts of equity have carefully refrained from defining the particular instances of fiduciary relations in such a manner that other and perhaps new cases might be excluded." *Abbitt*, 201 N.C. at 598, 160 S.E. at 906. The concept is not without definition, however:

> The relation may exist under a variety of circumstances; it exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence. . . . It is settled by an overwhelming weight of authority that the principle extends to every possible case in which there is confidence reposed on one side and the resulting superiority and influence on the other. The relation and the duties involved in it need not be legal; it may be moral, social, domestic, or merely personal.

*Id.* Beyond this intentionally amorphous description, "[t]he standard for finding a *de facto* fiduciary relationship is a demanding one: 'Only when one party figuratively holds all the cards—all the financial power or technical information, for example— have North Carolina courts found that the special circumstance of a fiduciary relationship has arisen.' " *Lockerman,* ___ N.C. App. at ___, 794 S.E.2d at 352 (quoting *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC,* 189 N.C. App. 601, 613, 659 S.E.2d 442, 451 (2008)).

As noted *supra,* counsel for Ms. Hager advocated that we expand the category of *de jure* fiduciary relationships to include assisted living facilities with memory wards and their residents, as licensed memory wards "possess[] 'special knowledge and skill' " concerning the care of those afflicted with cognitive impairments. *Black v. Littlejohn,* 312 N.C. 626, 646, 325 S.E.2d 469, 482 (1985) (holding physicians share a *de jure* fiduciary relationship with their patients because "the physician possesses special knowledge and skill in diagnosing and treating diseases and injuries, which the patient lacks, and the patient has sought and obtained the services of the physician because of such special knowledge and skill." (citation and internal quotation marks omitted)). We decline to establish a new *de jure* rule for two reasons.

First, to create a *de jure* fiduciary relationship on the basis of special knowledge and skill alone would greatly expand the "limited" list that our Supreme Court has "not add[ed] to . . . lightly." *CommScope,* 369 N.C. at 52, 790 S.E.2d at 660.

Second, a person may wish to place a relative with Alzheimer's in a long-term care facility for reasons other than the specialized knowledge of care providers, whether for a lack of physical space in the home or insufficient time to provide the necessary degree of care and supervision. By contrast, a patient seeks the assistance of a physician to resolve a medical ailment, injury, condition, or concern that involves highly personal information and requires the specialized knowledge and skill of a doctor to address. *Black*, 312 N.C. at 646, 325 S.E.2d at 482. We do not, therefore, hold that all long-term care facilities owe a fiduciary duty to all residents in their memory wards.

Turning to the existence of a *de facto* fiduciary duty, our Supreme Court's decision in *King* presents the most relevant precedent. Mr. King was referred by his primary care physician to a surgeon to treat an acute medical condition. *King*, 369 N.C. at 455-56, 795 S.E.2d at 344. During his first visit to the surgeon's office, Mr. King was asked to provide confidential medical information and sign several documents. *Id.* at 456, 795 S.E.2d at 344. Among the documents was a "poorly drafted, confusing, and nonsensical" arbitration agreement that failed to define what arbitration was, state the patient in signing the agreement would waive his constitutional rights to a jury trial, or advise the patient to consult with an attorney prior to signing. *Id.* Mr. King, who lacked any education beyond high school and had limited exposure to legal documents, signed the arbitration agreement without

understanding its import or optional nature. *Id.* at 453, 795 S.E.2d at 343. Once the arbitration agreement and the other intake forms were signed, Mr. King met with and received treatment from the surgeon, who allegedly injured him in the course of the surgery. *Id.* at 452-53, 795 S.E.2d at 342-43. The surgeon sought to compel arbitration in Mr. King's ensuing lawsuit, and, following an appeal to and remand from this Court, the trial court denied the motion, concluding the surgeon: (1) owed Mr. King a fiduciary duty; and (2) breached that duty by failing to disclose all material terms of the arbitration agreement. *Id.* at 455-59, 795 S.E.2d at 344-46.

On a second appeal, we affirmed the trial court, and the Supreme Court allowed discretionary review. *Id.* at 461, 795 S.E.2d at 347. In modifying and affirming our decision, the Court held that the facts disclosed a *de facto* fiduciary relationship, because the patient: (1) was referred to the surgeon by his primary care physician, who already had a *de jure* fiduciary duty to the patient; (2) sought out the surgeon for his specialized skill and knowledge;[1] (3) provided the surgeon with confidential medical information on arrival and prior to being seen; and (4) "had received a limited education and had little to no experience interpreting legal documents." *Id.* at 466, 795 S.E.2d at 350. It made clear that its holding was determined by these facts, declining to impose a *de jure* fiduciary relationship and

---

[1] At oral argument, Ms. Hager's counsel argued that this factor alone was entirely dispositive of the Supreme Court's decision in *King*. Such a reading is not supported by the language of the opinion. *Id.* at 466, 795 S.E.2d at 350.

instead concluding a *de facto* one existed following "[a] careful examination of the information contained in the findings of fact made in the [trial court's earlier] May 2013 and November 2015 orders." *Id.* The trial court orders followed mandates by this Court and the Supreme Court for additional detailed factual findings concerning the nature of the parties' relationship. *Id.* at 455-62, 795 S.E.2d at 343-47.

The uncontroverted evidence and findings of fact made by the trial court in this case are readily distinguishable from the extensively developed facts that led to the conclusion that a fiduciary relationship existed in *King*. Ms. Hager was not referred to Gabriel Manor by a person who already owed her father a pre-existing fiduciary duty, but instead was referred by her chiropractor, who had never treated her father and who had no personal knowledge of his condition. Unlike Mr. King, Ms. Hager was not asked to sign the Arbitration Agreement before she could evaluate the care offered by Gabriel Manor; prior to signing the agreement, she toured the facility and was provided the opportunity to ask questions. She signed the agreement after assessing the facility with her friend, Ms. List, who also had the opportunity to offer her independent thoughts on the facility. The record below does not disclose Ms. Hager's degree of education. In light of these factual distinctions, *King*'s factually specific analysis and holding is not controlling here.

We also disagree with Ms. Hager's argument that the findings and evidence show she placed Mr. Hoffmaster with Gabriel Manor because of its staff's specialized

skill and knowledge in caring for people suffering from Alzheimer's. The trial court's findings of fact, which Ms. Hager does not dispute, include that on 27 October 2015 she "realized that the time had come that she could no longer care for her father in her home. *She did not feel as though she could violate his dignity by bathing and toileting him*." (emphasis added). The trial court also found that "Ms. Hager was desperate to place her father in a facility because she could no longer meet his needs[,]" which, reviewing her affidavit submitted to the trial court and uncontroverted by any other evidence, related to "bathing and personal care[,]" *i.e.,* needs common to all people, not just those with Alzheimer's and/or dementia.[2] Ms. Hager had cared for her father while he had dementia for over a year in her own home prior to admitting him to Gabriel Manor. We therefore distinguish *King* on this ground, as it does not appear that Ms. Hager sought out an assisted living facility because she was unable to exercise specialized knowledge or skill in caring for Mr. Hoffmaster's medical needs, and we do not weigh this factor in favor of concluding a fiduciary duty existed. *See King*, 369 N.C. at 465, 795 S.E.2d at 350 ("Individuals consult with surgeons, like they do with other physicians, *because* such persons possess 'special knowledge and skill . . . which the patient lacks;' accordingly, 'the patient has sought and obtained the services of the physician *because of* such special

---

[2] One of the documents presented to Ms. Hager in the course of admitting Mr. Hoffmaster was an "Inquiry Information" form. That form, given to all persons seeking to admit someone to Gabriel Manor, asks whether the person to be admitted needs help being bathed and clothed and, separately, whether the person should be placed in assisted living or memory care.

knowledge and skill.' " (quoting *Black*, 312 N.C. at 646, 325 S.E.2d at 482) (emphasis added)).

The only two facts common to both this case and *King* are the provision of confidential information by the party asserting the existence of a fiduciary duty and their lack of legal expertise. While it is true that the provision of confidential information places confidence in the recipient, that alone does not create a fiduciary duty; for example, people seeking home financing are often required to provide confidential information to lenders, yet those transactions "are considered arm's length and do not typically give rise to fiduciary duties." *Dallaire*, 367 N.C. at 368, 760 S.E.2d at 266 (citations omitted). And, unlike Mr. King, Ms. Hager provided the confidential information only after she had the opportunity to perform her own due diligence by touring and dining at Gabriel Manor with her friend. *Cf. King*, 369 N.C. at 466, 795 S.E.2d at 350 ("Before he even saw Dr. Bryant, Mr. King demonstrated sufficient trust and confidence in him to provide Dr. Bryant with confidential medical information."). Ms. Hager's lack of legal knowledge does not suffice to show the fiduciary relationship present in *King*, particularly when the Arbitration Agreement at issue here—in contrast to the agreement in *King*—outlined the nature of arbitration, identified the rights Mr. Hoffmaster was relinquishing, and encouraged Ms. Hager to seek the advice of legal counsel before signing. And unlike Mr. King, Ms. Hager had the right to cancel the Arbitration Agreement on her father's behalf

for any reason within 60 days, during which period she had the opportunity to monitor the care provided to him. In light of all the uncontroverted facts, we cannot conclude that when Ms. Hager signed the Arbitration Agreement, Gabriel Manor " 'figuratively [held] all the cards . . . [such] that the special circumstance of a fiduciary relationship ha[d] arisen.' " *Lockerman*, ___ N.C. App. at ___, 794 S.E.2d at 352 (quoting *S.N.R. Mgmt. Corp.*, 189 N.C. App. at 613, 659 S.E.2d at 451). We therefore reverse the trial court's order concluding Smithfield East owed Mr. Hoffmaster a fiduciary duty, whether that be through a *de jure* or *de facto* fiduciary relationship.

## D.  Standing to Compel Arbitration

Defendants also appeal the trial court's determination that the only party with standing to compel arbitration is Smithfield East,[3] based on the conclusion that "[t]here is no competent evidence that [the remaining Defendants] are agents of Smithfield East . . . such that they would benefit from their non-signatory status to the Arbitration Agreement." Indeed, with the exception of Smithfield East, each Defendant has denied the allegations in the complaint asserting the existence of relationships between them, and Saber Healthcare's general counsel filed an affidavit asserting that Saber Healthcare and Saber Holdings had "no involvement in the

---

[3] Neither party argues that the trial court erred in concluding Smithfield East was a party to the Arbitration Agreement.

management of staff, the provision of care, control over the day to day operations, or oversight of the operation or management of Smithfield East[.]"[4]  From this record, we hold that the trial court did not err in concluding only Smithfield East had standing to invoke the Arbitration Agreement, as there is no evidence to show a relationship between the Defendants within the scope of the Arbitration Agreement such that Mr. Hoffmaster agreed to arbitrate claims against the non-signatory Defendants.[5]  However, because the trial court failed to resolve this issue as to one of the non-signatory Defendants, Smithfield Operations, we remand to the trial court for further factual findings addressing that party.

Defendants rightly point out that in two decisions, this Court has allowed non-signatories to compel arbitration where an agency relationship exists between a non-signatory defendant and a signatory to a relevant arbitration agreement.  *Brown v. Centex Homes*, 171 N.C. App. 741, 745-46, 615 S.E.2d 86, 88-89 (2005); *Ellison v. Alexander*, 207 N.C. App. 401, 411-12, 700 S.E.2d 102, 110-11 (2010).  In both cases, however, the existence of a legally recognized relationship between the non-signatory and signatory was not in dispute.  *Brown*, 171 N.C. App. at 746, 615 S.E.2d at 89 ("Kroening did not sign the Contract which included the arbitration clause.  However,

---

[4] The parties pointed to no other evidence in the record concerning the existence or nature of any relationships between the Defendants.

[5] At oral argument, counsel for Defendants stated that this outcome would have no practical effect on the underlying litigation or arbitration should we reverse the trial court's order invalidating the Arbitration Agreement with Smithfield East.  We nonetheless must reach this issue because it was properly presented to the trial court and appealed to this Court.

her status as an agent of Centex affords her the right of arbitration."); *Ellison*, 207 N.C. App. at 405, 700 S.E.2d at 106 ("[A] number of pertinent facts, including the following, are not in dispute between the parties: Defendant is The Elevator Channel's CEO and a Board member.").[6]  Further, the party seeking to compel arbitration bears the burden of proving an agreement binding that party. *Sciolino v. TD Waterhouse Investor Services, Inc.*, 149 N.C. App. 642, 645, 562 S.E.2d 64, 66 (2002).  We disagree with Defendants' argument that this burden was satisfied based solely on the allegations in the complaint.

In *Revels v. Miss America Organization*, 165 N.C. App. 181, 599 S.E.2d 54 (2004), this Court dealt with an analogous issue governed by North Carolina's Uniform Arbitration Act.[7]  There, the plaintiff's complaint alleged the existence of a written contract; that contract, however, contained an arbitration clause. *Id.* at 186, 599 S.E.2d at 58.  The defendant denied that it had ever entered into the contract yet sought to compel arbitration based on the contract terms.  *Id.*  On appeal, the

---

[6] We note that there are other legal doctrines beyond those pertaining to agency relationships that may allow for a non-signatory to compel arbitration, such as estoppel.  *Carter v. TD Ameritrade Holding Corp.*, 218 N.C. App. 222, 227-29, 721 S.E.2d 256, 261-62 (2012) (listing the various legal theories available to non-signatories).  Defendants, however, have not raised any of these other grounds on appeal.

[7] Although the substantive provisions of an arbitration agreement may be governed, for purposes of substantive law, by the FAA, it is nonetheless governed by the procedural provisions of North Carolina's Revised Uniform Arbitration Act when the issue of its arbitration is raised in our Courts.  *Carter*, 218 N.C. App. at 226, 721 S.E.2d at 260.  That *Revels* involved an arbitration agreement governed by the Revised Uniform Arbitration Act's predecessor statute and not the FAA is, therefore, a distinction without a difference for the purposes of our analysis.  *See Revels*, 165 N.C. App. at 187, 599 S.E.2d at 58 ("[W]e discern this to be a procedural, rather than substantive, issue.").

defendant "argue[d] that its burden . . . of showing a written agreement to arbitrate has been met by plaintiff's own pleadings, which uniformly allege the existence of a valid and binding contract . . . which contains an arbitration clause." *Id.* at 188, 599 S.E.2d at 59. We rejected the defendant's argument based on its denial of the plaintiff's allegations:

> It is undisputed that the [contract] was not signed by [the defendant]. Moreover, it is clear from [the defendant's] pleadings and the arguments of its counsel that, for purposes of defending against the merits of plaintiff's breach of contract claims, [the defendant] has throughout this litigation denied acceptance of the [contract] as a contract between itself and the plaintiff. Because the arbitration clause contained within the [contract] was the sole basis for [the defendant's] amended motion to compel arbitration, we hold that the trial court's findings support its conclusion that [the defendant] failed to carry its burden of proving the existence of a written agreement between plaintiff and [the defendant] to arbitrate[.]

*Id.* at 189, 599 S.E.2d at 59.

We are not convinced, based on the evidence introduced below, that the non-signatory Defendants in this case have standing to compel arbitration when they have denied the existence of all alleged relationships and failed to introduce any evidence of some other recognized connection to Smithfield East. We acknowledge that there exists a presumption in favor of arbitration; however, that presumption applies to the issue of whether the claims fall within the scope of a valid arbitration agreement, not to the initial determination of whether there exists a valid agreement to arbitrate *between the parties in question*. *AVR Davis Raleigh, LLC v. Triangle*

*Construction Co., Inc.*, ___ N.C. App. ___, ___, 818 S.E.2d 184, 187 (2018). Here, the parties to the Arbitration Agreement—Mr. Hoffmaster and Smithfield East—agreed to arbitrate "claims against the Facility, its employees, agents, officers, directors, any parent, subsidiary or affiliate of the Facility." Though we hold that the Arbitration Agreement was valid between its signatories (and Smithfield East is therefore entitled to the presumption that Mr. Hoffmaster's claims against it fall within that agreement), the non-signatory Defendants have failed to introduce evidence showing: (1) that they are parties to any arbitration agreement with Mr. Hoffmaster; or (2) that there exists an employee, agent, officer, director, parent, subsidiary, or affiliate relationship with Smithfield East within the meaning of the Arbitration Agreement. Thus, absent any evidence showing the existence of a relationship covered by the Arbitration Agreement, the non-signatory Defendants have failed to establish that they and Mr. Hoffmaster "mutually agreed to arbitrate their disputes[,]" *Routh v. Snap-On Tools Corp.*, 108 N.C. App. 268, 271-72, 423 S.E.2d 791, 794 (1992), and this presumption in favor of arbitration does not come into play.[8]

---

[8] We note that at least one federal circuit appeals court has held, albeit in an unpublished opinion, that a non-signatory defendant failed to meet its evidentiary burden to compel arbitration where it denied the agency relationship alleged in the complaint and introduced evidence disclaiming such a relationship. *Roes v. SFBSC Management, LLC*, 656 Fed. Appx. 828 (9th Cir. 2016) (unpublished). This Court has previously done the same where there was no evidence indicating a relationship with a signatory. *Adams v. Pulliam*, 177 N.C. App. 286, 628 S.E.2d 259, 2006 WL 998090, *1-2 (unpublished) (April 18, 2006) ("First, we must determine who were the parties to the . . . agreement so that we can determine whether the party who brought the arbitration proceeding . . . had standing to do so. . . . [T]he party who filed the demand for arbitration . . . did not sign the agreement, was not a party to the agreement, nor did it succeed to any of the rights of either of the

Our holding, however, does not reach Smithfield Operations. The trial court failed to make any findings or conclusions concerning Smithfield Operations in the order denying the motion to compel. On remand, the trial court must make findings from the evidence concerning Smithfield Operations' relationship with Smithfield East and resolve whether that party has standing to compel arbitration.

### III. **CONCLUSION**

For the reasons set forth above, we reverse the trial court's determination that Smithfield East owed and breached a fiduciary duty to Mr. Hoffmaster such that the Arbitration Agreement is unenforceable. We affirm its conclusion that the non-signatory Defendants lacked standing to compel arbitration, with the exception of Smithfield Operations, and remand for further findings and conclusions concerning whether that entity has standing. On remand, the trial court shall enter an order staying and ordering arbitration of all claims against Smithfield East; it shall also determine whether the claims against the remaining Defendants shall be stayed pending arbitration. *See Sloan Financial Group, Inc. v. Beckett*, 159 N.C. App. 470, 485, 583 S.E.2d 325, 334 (2003) (noting that whether to stay nonarbitrable claims while arbitration of other claims is pending is in the discretion of the trial court).

REVERSED IN PART, AFFIRMED IN PART AND REMANDED.

Judge DAVIS concurs.

---

parties who did sign the agreement. . . . Thus, . . . it did [not] have standing to compel arbitration of a dispute[.]").

Judge BRYANT concurs in the result only.