McNew v. Fletcher Hosp., Inc, 2022 NCBC 53.

STATE OF NORTH CAROLINA

MADISON COUNTY

CHARLES SANDERS MCNEW, for
himself & on behalf of all others
similarly situated,

      Plaintiff,

v.

FLETCHER HOSPITAL, INC., d/b/a
ADVENTHEALTH
HENDERSONVILLE, INC.,

      Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
22 CVS 19

**ORDER AND OPINION ON
DEFENDANT'S MOTION TO DISMISS
AMENDED COMPLAINT**

1.    **THIS MATTER** is before the Court on Defendant Fletcher Hospital, Inc., d/b/a AdventHealth Hendersonville, Inc.'s ("Defendant" or the "Hospital") Motion to Dismiss Plaintiff Charles Sanders McNew's ("Plaintiff" or "McNew") Amended Complaint (the "Motion") under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure (the "Rule(s)") filed 25 May 2022 in the above-captioned action.[1]

2.    Having considered the Motion, the related briefing, and the arguments of counsel at the hearing on the Motion, the Court hereby **GRANTS** in part and **DENIES** in part the Motion as set forth below.

> *McNew, P.A., by Charles S. McNew, for Plaintiff Charles Sanders McNew, for himself and on behalf of all others similarly situated.*
>
> *Roberts & Stevens, P.A., by Philip Pence, Phillip T. Jackson, John D. Noor, and David C. Hawisher, for Defendant Fletcher Hospital, Inc. d/b/a AdventHealth Hendersonville, Inc.*

Bledsoe, Chief Judge.

---

[1] (ECF No. 15.)

I.

FACTUAL BACKGROUND

3. The Court does not make findings of fact when ruling on a motion to dismiss under Rule 12(b)(6). The following background assumes that the allegations of the Amended Complaint are true. *See, e.g.*, *White v. White*, 296 N.C. 661, 667 (1979) (requiring the trial court to treat a complaint's allegations as true under Rule 12(b)(6)).

4. On 30 June 2021, McNew sought medical treatment at the Hospital's emergency room for injuries sustained to his side and head that evening when he fell from a six-foot high wall at his home in Marshall, North Carolina.[2] A triage nurse at the Hospital took information from McNew, performed a brief examination of his injuries, processed his admission to the emergency room, and scheduled McNew to receive two diagnostic tests: a cranial CT scan without contrast dye, and chest x-rays. These diagnostic tests were performed by two different hospital technicians.[3]

5. Wake Forest Emergency Providers ("Wake Forest") performs emergency room services for the Hospital as an independent contractor. McNew was not examined by a physician present at the Hospital but instead was diagnosed remotely by one of Wake Forest's physicians, Dr. Jason Strombaugh.[4]

---

[2] (Am. Compl. ¶¶ 15–16, ECF No. 11.)

[3] (Am. Compl. ¶¶ 21–24.)

[4] (Am. Compl. ¶¶ 25, 27–28.)

6.      McNew was discharged from the hospital early the following morning and, in September 2021, and he received a bill from the Hospital in the total amount of $4,413.48 for his care ($1,440.00 for "Emergency Center"; $2,509.86 for "CT Scan Imaging"; and $463.62 for "Radiology/Services"). After accounting for insurance payments received on McNew's behalf, the Hospital's billing statement reflected that McNew owed the Hospital an uninsured balance of $2,667.96.[5] McNew alleges that the Hospital's charges for the emergency and imaging services it provided far exceed those disclosed in its published rates as well as those of similar providers providing similar services both locally and nationally.[6]

7.      McNew also claims that Defendant's charges are part of a systematic practice of "surprise billing" involving the charging of undisclosed fees far beyond the actual worth of the provided services, resulting in harm to consumers.[7] In particular, he alleges that the Hospital never disclosed that it would charge rates far in excess of both its published rates and local and national market rates or that its charges would substantially exceed the amount of his insurance reimbursement.[8] He avers

---

[5] (Am. Compl. ¶¶ 29–31.) Plaintiff also received a separate bill from Wake Forest in the total amount of $463.00 for Dr. Strombaugh's services. After accounting for insurance, Wake Forest billed McNew $72.41 for this medical care. (Am. Compl. ¶¶ 33–34.)

[6] (Am. Compl. ¶¶ 35–43.) For example, McNew pleads that he was charged $2,667.96 for a cranial CT scan without contrast dye even though the Hospital's online price estimator states that the price for that scan is $205.58, Asheville's Mission Imaging Services' published fee schedule prices the scan at $457.32, and the national average for the scan is $449.00. (Am. Compl. ¶¶ 35–38.)

[7] (Am. Compl.¶¶ 2–3.)

[8] (Am. Compl. ¶¶ 43–44.)

that the Hospital did not post a price schedule visible to consumers in the public areas of the emergency room or give him a fee schedule or fee estimate prior to providing him emergency and imaging services.[9]

8.     Plaintiff attempted to negotiate a reduction in the amounts he was charged with a Hospital supervisor but was unsuccessful.  The supervisor advised him that the Hospital's charges for the services he received were the "usual and customary amounts they charge all consumers for th[o]se services."[10]  After agreeing to a review, the  Hospital reissued Plaintiff's bill without modification on 27 October 2021.[11]

II.

PROCEDURAL BACKGROUND

9.     McNew asserts this action individually and on behalf of a purported class of all North Carolina citizens that he alleges the Hospital has, without notice, charged amounts in excess of prevailing local or national rates for emergency and imaging services within the past four years.[12]  He asserts individual and class claims for (i) violation of North Carolina's Unfair and Deceptive Trade Practices Act

---

[9] (Am. Compl. ¶¶ 17–18.)

[10] (Am. Compl. ¶ 53.)

[11] (Am. Compl. ¶ 56.)

[12] (Am. Compl. ¶ 57.)

("UDTPA"), N.C.G.S. § 75-1.1 (ii) breach of fiduciary duty, (iii) constructive fraud, and (iv) breach of contract.[13]

10.    Defendant filed the Motion on 25 May 2022. After full briefing, the Court held a hearing on the Motion on 30 August 2022. At the Hearing, Defendant conceded that Plaintiff had sufficiently pleaded his claim for breach of contract and withdrew its Motion as to that claim. As a result, the Court need address Defendant's Motion only to the extent it seeks to dismiss Plaintiff's claims for breach of fiduciary duty, constructive fraud, and unfair and deceptive trade practices under section 75-1.1. The Motion is now ripe for resolution.

III.

LEGAL STANDARD

11.    In ruling on a motion to dismiss under Rule 12(b)(6), the Court may only consider the pleading and "any exhibits attached to the [pleading,]" *Krawiec v. Manly*, 370 N.C. 602, 606 (2018). The Court examines "whether the allegations of the complaint, if treated as true, are sufficient to state a claim upon which relief can be

---

[13] (Am. Compl. ¶¶ 73, 84, 89, 98, 104.) McNew also included an individual claim for fraud in his Amended Complaint, (Am. Compl. ¶¶ 99–104), but consents to its dismissal for failure to state a claim under Rule 12(b)(6), (*see* Pl.'s Br. Opp'n Mot. Dismiss Am. Compl. 3, n.2, ECF No. 23.) Given that Plaintiff did not seek to persuade the Court that he should be afforded an opportunity to amend his fraud claim or that the dismissal of the claim should be without prejudice, the Court, in the exercise of its discretion, shall dismiss Plaintiff's fraud claim with prejudice. *See, e.g.*, *First Fed. Bank v. Aldridge*, 230 N.C. App. 187, 192 (2013) (affirming dismissal with prejudice under Rule 12(b)(6) when "nothing in the record indicat[ed] that Plaintiff moved that the dismissal be without prejudice"); *see also Johnson v. Bollinger*, 86 N.C. App. 1, 9 (1987) ("Since the dismissal order operates as an adjudication on the merits unless the order specifically states to the contrary, the party whose claim is being dismissed has the burden to convince the court that the party deserves a second chance; thus, the party should move the trial court that the dismissal be without prejudice.")

granted under some legal theory." *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (quoting *CommScope Credit Union v. Butler & Burke, LLP*, 369 N.C. 48, 51 (2016)). The Court, however, is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Izydore v. Alade*, 242 N.C. App. 434, 438 (2015) (quoting *Strickland v. Hedrick*, 194 N.C. App. 1, 20 (2008)). The Court may also ignore a party's legal conclusions set forth in its pleading. *See McCrann v. Pinehurst, LLC*, 225 N.C. App. 368, 377 (2013).

12. "Dismissal of an action under Rule 12(b)(6) is appropriate when the complaint 'fail[s] to state a claim upon which relief can be granted.' " *Arnesen v. Rivers Edge Golf Club & Plantation, Inc.*, 368 N.C. 440, 448 (2015) (alteration in original) (quoting N.C. R. Civ. P. 12(b)(6)). The Supreme Court of North Carolina has determined that a "complaint fails in this manner when: '(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim.' " *Krawiec*, 370 N.C. at 606 (quoting *Wood v. Guilford Cty.*, 355 N.C. 161, 166 (2002)).

A. Breach of Fiduciary Duty

13. To successfully plead a claim for breach of fiduciary duty, "a plaintiff must show that: (1) the defendant owed the plaintiff a fiduciary duty; (2) the defendant breached that fiduciary duty; and (3) the breach of fiduciary duty was a proximate cause of injury to the plaintiff." *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 339 (2019). "Thus, to make out a claim for breach of a fiduciary duty,

plaintiffs must first allege facts that, taken as true, demonstrate that a fiduciary relationship existed between the parties." *Id.* at 339–40.

14. "[A] fiduciary relationship is generally described as arising when 'there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence.'" *Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 367 (2014) (quoting *Green v. Freeman*, 367 N.C. 136, 141 (2013)). "North Carolina recognizes two types of fiduciary relationships: *de jure*, or those imposed by operation of law, and *de facto*, or those arising from the particular facts and circumstances constituting and surrounding the relationship." *Hager v. Smithfield E. Health Holdings, LLC*, 264 N.C. App. 350, 355 (2019) (citing *Lockerman v. S. River Elec. Membership Corp.*, 250 N.C. App. 631, 635 (2016)).

15. The Supreme Court of North Carolina has cautioned that "[t]he list of relationships that we have held to be fiduciary in their very nature is a limited one, and we do not add to it lightly." *CommScope Credit Union v. Butler & Burke, LLP*, 369 N.C. 48, 52 (2016) (citation omitted). As noted by the Court of Appeals, "[t]hat list has, thus far, been limited to legal relationships, including attorney and client, physician and patient, spouses, business partners, and guardian and ward," *Hager*, 264 N.C. App. at 355. *See King v. Bryant*, 369 N.C. 451, 464 (2017) (listing *de jure* fiduciary relationships).

16. McNew argues that his relationship with the Hospital during his emergency room visit was a fiduciary one by operation of law, contending that the

Hospital's duty to its patient in the emergency room setting is no different than the *de jure* fiduciary duty that a physician owes to his or her patient.[14] *See, e.g., Watts v. Cumberland Cty. Hosp. Sys., Inc.,* 317 N.C. 110, 116 (1986) ("the relationship of patient and physician is considered to be a fiduciary one 'imposing upon the physician the duty of good faith and fair dealing.' " (quoting *Black v. Littlejohn,* 312 N.C. 626, 646 (1985)). As a result, McNew contends that his breach of fiduciary duty claim must survive Defendant's Motion on this ground. The Court disagrees.

17. The *de jure* fiduciary duty McNew seeks to establish arises from the Hospital's charges and billing practices, not from the care that the Hospital provided to him. The concerns driving the North Carolina courts to recognize a *de jure* fiduciary duty between a physician and his or her patient—i.e., the "special knowledge and skill in diagnosing and treating diseases and injuries, which the patient lacks," that drives the patient to choose the physician, *King,* 369 N.C. at 451 (quoting *Black,* 312 N.C. at 646), and the high level of personal trust and confidence undergirding the patient's decision to disclose sensitive, confidential medical information to the physician and rely on that physician's treatment advice—are simply not present in a patient's billing relationship with the Hospital. The billing relationship is instead one of debtor and creditor, which our courts have made clear is not a *de jure* fiduciary relationship. *See, e.g., Dallaire,* 367 N.C. at 368 ("The 'mere existence of a debtor-creditor relationship between the parties does not create a

---

[14] (Am. Compl. ¶¶ 76, 78.)

fiduciary relationship.'" (quoting *Branch Banking & Trust Co. v. Thompson,* 107 N.C. App. 53, 61 (1992) (cleaned up)).

18. Perhaps not surprisingly, Plaintiff has not cited, nor has the Court located, any case—from North Carolina or any other jurisdiction—in which a court has found that a hospital's billing relationship with its patient is a fiduciary one by operation of law. Indeed, courts that have considered the issue have found to the contrary. *See, e.g., Hill v. Sisters of St. Francis Health Servs., Inc.,* No. 06 C 1488, 2006 U.S. Dist. LEXIS 92874, *9 (N.D. Ill. 2006) (under Illinois law, "there is no fiduciary duty between a hospital and its patients with respect to billing practices"); *Burton v. William Beaumont Hosp.,* 373 F. Supp. 2d 707, 723–24 (E.D. Mich. 2005) ("While Michigan courts have recognized fiduciary relationships such as . . . doctors and patients, there is no authority for the proposition that a fiduciary relationship exists between a hospital and a patient for what plaintiffs complain of here, namely billing practices.") (citation omitted); *Morrell v. Wellstar Health Sys., Inc.,* 280 Ga. App. 1, 7–8 (2006) (under Georgia law, "we hold that a nonprofit hospital generally has no fiduciary duty to a patient with respect to the price the hospital charges for medical care."); *see also Dicarlo v. St. Mary's Hosp.,* Civil Action No. 05-1665 (DRD-SDW) 2006 U.S. Dist. LEXIS 49000, *27 (D.N.J. Jul. 19, 2006) (concluding that "it is unlikely that the New Jersey courts would expand a hospital's fiduciary duty to its billing practices").

19. Based on the above, the Court concludes that Plaintiff has failed to plead that the Hospital owed him a *de jure* fiduciary duty in connection with the Hospital's billing practices.

20. Plaintiff's additional contention that he enjoyed a *de facto* fiduciary relationship with the Hospital fares no better.[15] A *de facto* fiduciary relationship exists when there is " 'confidence reposed on one side, and resulting domination and influence on the other.' " *Dalton v. Camp*, 353 N.C. 647, 652 (2001) (quoting *Abbitt v. Gregory*, 201 N.C. 577, 598 (1931)) (cleaned up). "The standard for finding a *de facto* fiduciary relationship is a demanding one: 'Only when one party figuratively holds all the cards—all the financial power or technical information, for example—have North Carolina courts found that the special circumstance of a fiduciary relationship has arisen.' " *Lockerman*, 250 N.C. App. at 636 (quoting *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 613 (2008)).

21. Of significance here, "[o]ur courts have been clear that general contractual relationships do not typically rise to the level of fiduciary relationships." *Sykes*, 372 N.C. at 340. "Parties to a contract do not thereby become each other's fiduciaries; they generally owe no special duty to one another beyond the terms of the contract[.]" *Id.* (quoting *Branch Banking & Tr. Co.*, 107 N.C. App. at 61)); *see also Dallaire*, 367 N.C. at 368 ("An ordinary debtor-creditor relationship generally does not give rise to . . . a special confidence") (cleaned up).

---

[15] (Am. Compl. ¶ 78.)

22.     Even when one party is in the "position as the holder of the purse strings," "no [fiduciary] relationship arises absent the existence of dominion and control by one party over another." *Kaplan v. O.K. Techs., L.L.C.*, 196 N.C. App. 469, 474 (2009). "In the event that a party 'fail[s] to allege any special circumstances that could establish a fiduciary relationship,' dismissal of a claim which hinges upon the existence of such a relationship would be appropriate." *Azure Dolphin, LLC v. Barton*, 371 N.C. 579, 599 (2018) (citation omitted).

23.     Here, McNew received medical care for his injuries at the Hospital's emergency room. McNew pleads that the Hospital "occupied a position of superior power and influence" over him in the Hospital's subsequent billing.[16] However, McNew does not plead any facts to support that claim. He does not challenge the adequacy of the medical care he received or question the medical knowledge of the Hospital's staff;[17] he challenges only the amount he was billed after the services were rendered, and he provides insufficient facts to plead the substantial difference in bargaining power our courts require to establish that he had a *de facto* fiduciary relationship with the Hospital.

24.     To the contrary, McNew pleads that he "agreed to pay [the Hospital] an unspecified sum representing the uninsured portion of the costs of care as a [Hospital] patient," and contends that the Hospital "breached its contract with Plaintiff by charging him rates that far exceeded its own published rates, as well as other

---

[16] (Am. Compl. ¶¶ 77, 80.)

[17] (Am. Compl. ¶ 69.)

comparable rates from other providers, for the services it provided."[18] Plaintiff's relationship with the Hospital for its charges is thus defined by contract, and Plaintiff alleges no facts that suggest that the parties' billing relationship imposed duties on either party beyond those contract duties. Plaintiff's contentions that the Hospital had a fiduciary duty not to "goug[e]" him with charges for "emergency and imaging services far in excess of local or national rates" and "to disclose its billing rates and practices before performing services on Plaintiff's behalf"[19] are duties arising from the parties' contract, not duties arising from a fiduciary relationship between them.

25.     Accordingly, the Court concludes that McNew has failed to allege that he had either a *de jure* or a *de facto* fiduciary relationship with the Hospital. As a result, Plaintiff's claim for breach of fiduciary duty must be dismissed.

B. Constructive Fraud

26.     "A constructive fraud claim requires a plaintiff to allege and show (1) that the defendant owes the plaintiff a fiduciary duty; (2) that the defendant breached that duty; and (3) that the defendant sought to benefit himself in the transaction." *Ironman Med. Props., LLC v. Chodri*, 268 N.C. App. 502, 513 (2019) (cleaned up). A confidential or fiduciary relationship is a prerequisite to sustaining a constructive fraud claim. *See Head v. Gould Killian CPA Grp., P.A.*, 371 N.C. 2, 9 (2018) (stating that " '[c]onstructive fraud arises where a confidential or fiduciary relationship exists[.]' ") (cleaned up). As made clear above, Plaintiff has failed to plead a fiduciary

---

[18] (Am. Compl. ¶¶ 91, 98.)

[19] (Am. Compl. ¶¶ 81–82.)

relationship with the Hospital and has not otherwise pleaded facts showing a confidential one on which a constructive fraud claim may rest. Accordingly, Plaintiff's constructive fraud claim must be dismissed.

C. <u>Unfair and Deceptive Trade Practices</u>

27. Under the UDTPA, "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C.G.S. § 75-1.1(a). To state a UDTPA claim, a plaintiff must allege: "(1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiff[.]" *Walker v. Fleetwood Homes of N.C., Inc.*, 362 N.C. 63, 71–72 (2007) (quoting *Gray v. N.C. Ins. Underwriting Ass'n*, 352 N.C. 61, 68 (2000)). " 'A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers,' and a 'practice is deceptive if it has the capacity or tendency to deceive.' " *Bumpers v. Cmty. Bank of N. Va.*, 367 N.C. 81, 91 (2013) (quoting *Walker*, 362 N.C. at 72). "Neither fraud, bad faith, deliberate acts of deception or actual deception need be shown, but the acts must have had a tendency or capacity to mislead or created the likelihood of deception." *Moretz v. Miller*, 126 N.C. App. 514, 518 (1997).[20]

---

[20] To the extent that Plaintiff premises his UDTPA claim against the Hospital on his claims for breach of fiduciary duty and constructive fraud, (Am. Compl. ¶ 70), the UDTPA claim necessarily fails because of Plaintiff's failure to adequately plead the underlying claims. *See Craven v. SEIU COPE*, 188 N.C. App. 814, 819 (2008) (dismissing an unfair and deceptive trade practices claim where the underlying tort was dismissed); *Crescent Foods, Inc. v. Evason Pharms., Inc.*, 2016 NCBC LEXIS 76, *27 (N.C. Sup. Ct. Oct. 5, 2016) (dismissing UDPTA claim based on dismissed claims for breach of fiduciary duty and fraud).

28.     Defendant contends that Plaintiff's UDTPA claim should be dismissed under the learned profession exemption to section 75-1.1.  *See* N.C.G.S. § 75-1.1 (stating, in pertinent part, that "(a) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." and that "(b) For purposes of this section, "commerce" includes all business activities, however denominated, *but does not include professional services rendered by a member of a learned profession*.")  (emphasis added).

29.     Although addressed on numerous occasions by our Court of Appeals, the Supreme Court of North Carolina first considered the learned profession exemption in *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326 (2019).  There, the Court explained that courts must "conduct a two-part inquiry to determine whether the 'learned profession' exemption applies: '[F]irst, the person or entity performing the alleged act must be a member of a learned profession.  Second, the conduct in question must be a rendering of professional services."  *Id.* at 334.  As such, the Court recognized that "a matter affecting the professional services rendered by members of a learned profession . . . falls within the exception in N.C.G.S. § 75-1.1(b)."  *Id.* (cleaned up).

30.     *Sykes*, like this case, involved the application of the learned profession exemption in the healthcare industry.  *Sykes* recognized both that "members of health care professions fall within the learned profession exemption to N.C.G.S. § 75-1.1,"[21] and that "this exception for medical professionals has been broadly interpreted."

---

[21] Hospitals are included within the definition of "medical professionals" under the exemption.  *See Shelton v. Duke Univ. Health Sys.*, 179 N.C. App. 120, 126 (2006).

(cleaned up). *Id.* A challenge for the courts in applying the exemption has been in deciding whether the activity at issue is sufficiently related to the provision of patient care to be excluded from the reach of the UDTPA. *Id.*

31.    For example, in *Sykes*, the Supreme Court concluded that because the defendant's actions in "terminat[ing plaintiff chiropractic] providers' in-network access to patients when those providers exceed[ed] a certain average cost per patient" reduced the level of chiropractic services patients actually received, defendant's conduct was "directly related to providing patient care" and thus exempted from the UDTPA by section 75-1.1(b). *Id.* at 336. The Court of Appeals has reached the same conclusion in similar contexts. *See, e.g.*, *Wheeless v. Maria Parham Med. Ctr., Inc.*, 237 N.C. App. 584, 590 (2014) (concluding "defendant-doctors' alleged conduct in making a complaint to the Medical Board [about plaintiff doctor's inappropriate and disruptive behavior was] integral to their role in ensuring the provision of adequate medical care"); *Burgess v. Busby*, 142 N.C. App. 393, 407 (2001) (concluding defendant-doctor's discouragement of other doctors from providing health care to plaintiffs "affect[ed] the professional services rendered by members of a learned profession"); *Cameron v. New Hanover Memorial Hospital*, 58 N.C. App. 414, (1982) (exempting defendant-hospital's denial of staff privileges to plaintiff-podiatrists because the "consideration of whom to grant hospital staff privileges is a necessary assurance of good health care"); *see also Gaunt v. Pittaway*, 139 N.C. App. 778, 784 (2000) (exempting defendant-doctors' allegedly defamatory statements about plaintiff-doctor's training, expertise, and practices); *Abram v. Charter Medical Corp.*,

100 N.C. App. 718, 722–723 (1990) (exempting defendant medical provider's opposition to plaintiff provider's CON application for allegedly illegitimate reasons).

32.    At the same time, the Supreme Court has recognized that "the mere status of a defendant as a member of a 'learned profession' does not shield that defendant from any claim under N.C.G.S. § 75-1.1 regardless of how far removed the claim is from that defendant's professional practice." *Sykes*, 372 N.C. at 336. Consistent with this principle, the Court of Appeals concluded, prior to *Sykes*, in *Hamlet H.M.A., LLC v. Hernandez*, 262 N.C. App. 51 (2018), that the learned profession exemption did not bar a defendant doctor's counterclaim that he had been fraudulently induced to enter an employment contract with the plaintiff hospital. The Court of Appeals rejected the notion that "negotiations regarding a business arrangement, even between a physician and a hospital" are exempted from the UDTPA, concluded that "[t]he learned profession exception does not cover claims simply because the participants in the contract are medical professionals," *id.* at 64, and held that the parties' contract dispute "involve[d] a business deal, not rendition of professional medical services." *Id.* at 63.[22]

33.    Mindful of these decisions, the Court must determine whether the Hospital's alleged conduct is sufficiently related to the provision of patient care to fall within the exemption.  The Court concludes that it is.  As an initial matter, the Hospital's bills reflect the Hospital's charges for the medical care Plaintiff received in the emergency room; in that way, they directly relate to the provision of Plaintiff's

---

[22] The Supreme Court in *Sykes* discussed but did not expressly adopt or approve the Court of Appeals' holding in *Hamlet H.M.A., LLC.  See Sykes*, 372 N.C. at 335.

medical care. In addition, Plaintiff's UDTPA claim based on those charges challenges not only the amounts the Hospital charged, but also the Hospital's conduct in not disclosing those charges in the course of rendering its emergency and imaging services to Plaintiff.[23] In contrast to the employment contract at issue in *Hamlet H.M.A., LLC*, which was a business contract that enabled the defendant's subsequent provision of medical services, the Hospital's alleged misconduct here—overbilling without disclosing its actual rates to Plaintiff at the time of treatment—is entwined with, and directly tied to, the provision of Plaintiff's medical care at the Hospital's emergency room.

34. Particularly given our appellate courts' expansive interpretation of the learned profession exemption in the healthcare field, the Court concludes, based on the above, that Plaintiff's UDTPA claim is sufficiently tied to the provision of patient care to fall within the exemption's reach. *See, e.g.*, *Shelton v. Duke Univ. Health Sys.*, 179 N.C. App. 120, 121 (2006), (affirming dismissal of UDTPA claim premised on hospital's provision of allegedly misleading billing information as exempt under section 75-1.1(b)); *McClean v. Duke Univ.*, 376 F. Supp. 3d 585, 610 (M.D.N.C. 2019) (concluding that "[s]tatements about medicine, treatment or billing are protected by the 'learned profession' exclusion to [section] 75-1.1, while statements made by doctors outside of those categories (such as during business negotiations) are not."); *see also Alamance Family Practice, P.A.*, 2018 NCBC LEXIS 83, *20–21 (N.C. Super.

---

[23] (Am. Compl. ¶ 71 ("AdventHealth's practice of billing for services far in excess of market rates, without disclosing its billing practices in advance of rendering services, is deceptive to consumers.").

Ct. Aug. 14, 2018) (holding that exemption applied where defendant allegedly " 'fraudulently obtain[ed] patient information,' misappropriate[ed] Plaintiff's trade name and internet contacts, . . . us[ed] Plaintiff's funds to pay unauthorized expenses . . . form[ed] her own business while employed by Plaintiff[,] and solicit[ed] Plaintiff's patients").

35.     Accordingly, based on the above, the Court concludes that Defendant's motion to dismiss Plaintiff's UDTPA claim should be granted, and that claim shall therefore be dismissed.[24]

## III.

## CONCLUSION

36.     **WHEREFORE**, the Court, for the reasons set forth above, hereby **ORDERS** as follows:

a. Defendant's Motion is **GRANTED** as to Plaintiff's claims for breach of fiduciary duty, constructive fraud, fraud, and unfair and deceptive trade practices under section 75-1.1, and those claims are hereby **DISMISSED with prejudice**.

b. Defendant's Motion is **DENIED** as moot as to Plaintiff's claim for breach of contract, and that claim shall proceed to discovery.

**SO ORDERED**, this the 20th day of September 2022.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Chief Business Court Judge

---

[24] In light of the Court's conclusion, the Court declines to address Defendant's other grounds for dismissal of Plaintiff's UDTPA claim.