Howell v. Heafner, 2020 NCBC 65.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 21708

GAIL I. HOWELL, individually and
on behalf of the GAIL I. HOWELL
IRA; KEA L. HRVATIN; SCOTT J.
HRVATIN; STEVEN RAPP; ALICE
G. SHRADER, individually and on
behalf of the ALICE G.
SHRADER IRA; JONATHAN A.
TURNER, individually and on behalf
of the JONATHAN A. TURNER IRA;
CAROL B. WIGGINS, individually
and on behalf of the CAROL B.
WIGGINS IRA; DAVID M.
WRIGHT, JR.; BRIAN H. FETNER,
as executor of the ESTATE SHEILA
MARLOWE FETNER and personal
representative of SHEILA M.
FETNER; SUSAN A. GOLDMAN;
and THOMAS B. ODELL,
individually and on behalf of the
THOMAS B O'DELL IRA,

           Plaintiffs,

v.

JAMES H. HEAFNER;
FORMULAFOLIO INVESTMENTS,
LLC; and RETIREMENT WEALTH
ADVISORS, INC.,

           Defendants.

**ORDER AND OPINION ON
DEFENDANTS' MOTION TO DISMISS,
OR, IN THE ALTERNATIVE, STAY
AND COMPEL ARBITRATION AND
PLAINTIFFS' MOTION FOR LEAVE
TO FILE A SURREPLY, TO STRIKE,
OR TO ESTOP**

1. **THIS MATTER** is before the Court upon Defendants FormulaFolio

Investments, LLC ("FFI") and Retirement Wealth Advisors, Inc.'s ("RWA"; together,

the "Corporate Defendants") Motion to Dismiss, or, in the Alternative, Stay and

Compel Arbitration (the "Motion to Dismiss"), (ECF No. 16), and Plaintiffs Gail I.

Howell ("Howell"), Kea L. Hrvatin ("Kea Hrvatin"), Scott J. Hrvatin ("Scott Hrvatin"),

Steven Rapp ("Rapp"), Alice G. Shrader ("Shrader"), Jonathan A. Turner ("Turner"),

Carol B. Wiggins ("Wiggins"), David M. Wright, Jr. ("Wright"), Susan A. Goldman

("Goldman"), and Thomas B. ODell's ("ODell"; collectively, the "IMA Plaintiffs"[1]) Motion for Leave to File a Surreply to Section III of Corporate Defendants' Reply *and Either* to Strike Section I and to Estop Contradictory Legal Positions *or*, Alternatively, for Leave to File a Surreply to Section I (the "Motion to Strike"), (ECF No. 43), (collectively, the "Motions").

2. The IMA Plaintiffs allege in this action that they are unsophisticated investors who entrusted their investment funds to Defendant James "Jim" H. Heafner ("Heafner"), who in turn invested those funds in a sham company, 1 Global Capital LLC ("1 Global"), resulting in losses to the IMA Plaintiffs of over $1.5 million. (Am. Compl. ¶ 1, ECF No. 14.) The IMA Plaintiffs seek to recover their losses against Heafner and the Corporate Defendants. The Corporate Defendants have moved for the dismissal of the IMA Plaintiffs' claims against them or, in the alternative, to stay the case and compel the arbitration of the IMA Plaintiffs' claims.

3. Having considered the Motions, the Amended Complaint, the related briefing and attached exhibits, and the arguments of counsel at the hearing on the Motions, the Court, for the reasons set forth below, **DENIES** the Motion to Strike as

---

[1] The Corporate Defendants aver that neither FFI nor RWA has any record of doing business with Plaintiffs Brian H. Fetner and the Sheila Marlowe Fetner Estate, (Aff. Braun ¶ 8, ECF No. 18); hence, the Corporate Defendants do not bring the Motion to Dismiss as to the claims asserted by these two Plaintiffs. Similarly, the Corporate Defendants acknowledge that the Plaintiffs identified as individual retirement accounts ("IRA(s)")—the Gail I. Howell IRA, the Alice G. Shrader IRA, the Jonathan A. Turner IRA, the Carol B. Wiggins IRA, and the Thomas B. O'Dell IRA—did not sign arbitration agreements with the Corporate Defendants, (*see* Aff. Braun Exs. A– I, ECF Nos. 18.1–.9), and thus FFI and RWA do not bring the Motion to Dismiss as to the claims brought by these Plaintiffs either. To avoid confusion, the Court will hereinafter reference Plaintiffs Brian H. Fetner, the Sheila Marlowe Fetner Estate, the Gail I. Howell IRA, the Alice G. Shrader IRA, the Jonathan A. Turner IRA, the Carol B. Wiggins IRA, and the Thomas B. O'Dell IRA, collectively, as the "Non-IMA Plaintiffs."

moot, **DENIES** the Motion to Dismiss, **ORDERS** all claims asserted by the IMA

Plaintiffs against the Corporate Defendants to arbitration, and **STAYS** the litigation

of all claims in this action pending the arbitration.

> *Alexander Ricks, PLLC, by Nathan Adam White, and Marquardt Law Office, LLC, by Adam J. Marquardt, for Plaintiffs Gail I. Howell, individually and on behalf of the Gail I. Howell IRA; Kea L. Hrvatin; Scott J. Hrvatin; Steven Rapp; Alice G. Shrader, individually and on behalf of the Alice G. Shrader IRA; Jonathan A. Turner, individually and on behalf of the Jonathan A. Turner IRA; Carol B. Wiggins, individually and on behalf of the Carol B. Wiggins IRA; David M. Wright, Jr.; Brian H. Fetner, as executor of the Estate Sheila Marlowe Fetner and personal representative of Sheila M. Fetner; Susan A. Goldman; and Thomas B. ODell, individually and on behalf of the Thomas B O'Dell IRA.*

> *Parker Poe Adams & Bernstein LLP, by Morgan H. Rogers and Eric A. Frick, and Warner Norcross + Judd LLP, by Brian J. Masternak, for Defendants FormulaFolio Investments, LLC and Retirement Wealth Advisors, Inc.*

Bledsoe, Chief Judge.

I.

LEGAL STANDARD

4.      The Court and parties agree that the IMA Plaintiffs' Motion to Dismiss asks

the Court to determine whether there are enforceable agreements between the IMA

Plaintiffs and the Corporate Defendants to arbitrate the IMA Plaintiffs' claims.

Under North Carolina law, "the Court is required to make finding[s] [of] fact[ ] in

order to determine whether an 'enforceable agreement to arbitrate' exists[.]" *Cold*

*Springs Ventures, LLC v. Gilead Scis., Inc.*, 2015 NCBC LEXIS 1, at *6 (N.C. Super.

Ct. Jan. 6, 2015); *see also Cornelius v. Lipscomb*, 224 N.C. App. 14, 16, 734 S.E.2d

870, 871 (2012) (noting that our Court of Appeals has "repeatedly held" that an order

denying a motion to compel arbitration must include findings of fact as to arbitrability). "Accordingly, for such limited purpose, the court also may consider evidence as to facts that are in dispute." *Capps v. Blondeau*, 2010 NCBC LEXIS 10, at *5 n.6 (N.C. Super. Ct. Apr. 13, 2010). The Court therefore makes the following findings of fact based on the evidence of record submitted by the parties and conclusions of law solely for the purposes of resolving the Motion to Dismiss and without prejudice to any inconsistent findings the Court may make in any subsequent proceeding in this action.

II.

FINDINGS OF FACT[2]

5. According to Plaintiffs, at all relevant times, the IMA Plaintiffs were North Carolina residents in their fifties or sixties who had retired or were planning to retire in the near future. They invested, and subsequently lost, funds ranging from $94,307.66 to $442,332.00 in an investment recommended by Heafner called a Memorandum of Indebtedness ("MOI"). (Am. Compl. ¶¶ 8–14, 16–17.) The MOI took the form of a note issued by 1 Global. (Am. Compl. ¶¶ 2, 37, Ex. A.) Defendants have not challenged Plaintiffs' allegations in this regard, and the Court accepts them as true for the limited purposes of this Motion.

6. Also according to Plaintiffs, at all relevant times, Heafner was also a North Carolina resident providing investment services from his office in Charlotte, North Carolina. (Am. Compl. ¶ 18.) He became licensed to sell variable life and variable

---

[2] Any determination later stated as a conclusion of law that should have been stated as a finding of fact is incorporated into these Findings of Fact.

annuity investment products in 2008, (Am. Compl. ¶ 22), and became a Certified Financial Planner in 2014, (Am. Compl. ¶ 19). RWA registered Heafner as an investment adviser representative ("IAR") from approximately July 2014 until RWA terminated its association with him on August 31, 2018. (Am. Compl. ¶ 20.) Defendants have not challenged Plaintiffs' allegations in this regard either, and the Court accepts them as true for the limited purposes of this Motion.

7.     RWA was incorporated in Michigan in 2005 and has been a Registered Investment Adviser ("RIA") with the United States Securities and Exchange Commission ("SEC") since March 2007. (Am. Compl. ¶ 27, Ex. F.) RWA advertises that it provides investment management and personal finance planning services. (Am. Compl. ¶ 77, Ex. F.)

8.     FFI is a limited liability company formed in Michigan in 2010 and has been registered as an RIA since November 2011. (Am. Compl. ¶ 29, Ex. H.) FFI produces algorithmic software programs to generate trade orders for RWA accounts. (Am. Compl. ¶¶ 113, 115–18, Ex. H.) Until September 5, 2018, Jason Wenk served as CEO and President of both RWA and FFI. (Am. Compl. ¶¶ 27, 29, Exs. F, H.) At the times relevant to this action, the Corporate Defendants shared the same officers and owners. (Am. Compl. ¶ 3, Exs. F, H.)

9.     RWA and FFI act through agents like Heafner to provide investment services to clients. (Am. Compl. ¶¶ 214, 219, Exs. F, H.) According to the public Investment Adviser Public Disclosure database at https://adviserinfo.sec.gov/, both

companies registered IARs in the State of North Carolina starting in 2014 and have maintained at least twelve IARs in North Carolina since 2016. (Am. Compl. ¶ 34.)

10. RWA and FFI have held out to potential clients and in regulatory filings that they are "committed to [their] obligations to ensure . . . that [they] fulfill their fiduciary duty to clients or investors." (Am. Compl. ¶¶ 211–12, 215, Exs. F, H.)

11. To reach potential clients, Heafner frequently advertised himself as a retirement investing expert and an investment advisor with a fiduciary duty to his clients. These advertisements included spots on Charlotte radio and television stations, including WCNC's Charlotte Today show and WBTV's Morning Break broadcast, during which he provided tax and investment advice targeted at retirees. (Am. Compl. ¶¶ 60, 62–66, Ex. E.)

12. The IMA Plaintiffs describe themselves as unsophisticated investors, although a majority of them have some post-secondary education. (Aff. Howell ¶¶ 1–2, ECF No. 23; Aff. Kea Hrvatin ¶¶ 1–2, ECF No. 24; Aff. Scott Hrvatin ¶¶ 1–2, ECF No. 25; Aff. Rapp ¶ 1, ECF No. 26; Aff. Shrader ¶¶ 1, 3, ECF No. 27; Aff. Turner ¶ 1, ECF No. 28; Aff. Wiggins ¶ 1, ECF No. 29; Aff. Wright ¶¶ 1–2, ECF No. 30; Aff. Goldman ¶¶ 1–2, ECF No. 31; Aff. ODell ¶¶ 1–2, ECF No. 32.)

13. Each IMA Plaintiff was familiar with Heafner from his television appearances and advertising and, based on his representations, considered Heafner a fiduciary with an expertise in retirement investing who could help investors create a safe retirement plan. (Aff. Howell ¶ 3; Aff. Kea Hrvatin ¶ 3; Aff. Scott Hrvatin ¶ 3;

Aff. Rapp ¶¶ 2–3; Aff. Shrader ¶ 4; Aff. Turner ¶¶ 2, 4; Aff. Wiggins ¶¶ 2–3; Aff. Wright ¶ 2; Aff. Goldman ¶ 3; Aff. ODell ¶ 3.)

14. With that understanding, each IMA Plaintiff reached out to and met with Heafner in his Charlotte office to discuss hiring Heafner to invest some or all of that IMA Plaintiff's retirement savings. (Aff. Howell ¶ 4; Aff. Kea Hrvatin ¶¶ 3–4; Aff. Scott Hrvatin ¶¶ 3–4; Aff. Rapp ¶¶ 3–4; Aff. Shrader ¶¶ 6–7; Aff. Turner ¶¶ 4–5; Aff. Wiggins ¶¶ 3–4; Aff. Wright ¶¶ 2–3; Aff. Goldman ¶¶ 4–5; Aff. ODell ¶¶ 4–5.)

15. In initial meetings with each IMA Plaintiff at Heafner's Charlotte office, Heafner advised that he was a fiduciary and asked for (and received) information from the IMA Plaintiff concerning that IMA Plaintiff's finances, investments, and goals so Heafner could prepare appropriate investment recommendations. Each IMA Plaintiff advised Heafner that the IMA Plaintiff wanted a safe or conservative investment strategy. (Aff. Howell ¶ 4; Aff. Kea Hrvatin ¶ 5; Aff. Scott Hrvatin ¶ 4; Aff. Rapp ¶ 5; Aff. Shrader ¶ 8; Aff. Turner ¶ 5; Aff. Wiggins ¶ 5; Aff. Wright ¶ 3; Aff. Goldman ¶¶ 5–7; Aff. ODell ¶ 5.)

16. Heafner subsequently created a proposed investment plan for each IMA Plaintiff, recommending portfolios of annuities, FFI accounts, and 1 Global MOIs, which Heafner advised the IMA Plaintiff were "safe" or "low risk." (Aff. Howell ¶¶ 5–6; Aff. Kea Hrvatin ¶¶ 7–8; Aff. Scott Hrvatin ¶¶ 6–7; Aff. Rapp ¶¶ 6–8; Aff. Shrader ¶¶ 10, 19; Aff. Turner ¶¶ 7–8; Aff. Wiggins ¶¶ 6–7, 10–12; Aff. Wright ¶¶ 4, 8–9; Aff. Goldman ¶¶ 8–10; Aff. ODell ¶ 6.)

17. Each of the IMA Plaintiffs thereafter decided to retain Heafner as a financial advisor and implement the recommended investment plan, including the proposed investment in 1 Global's MOIs. (Aff. Howell ¶ 9; Aff. Kea Hrvatin ¶ 9; Aff. Scott Hrvatin ¶ 8; Aff. Rapp ¶ 11; Aff. Shrader ¶¶ 12, 19; Aff. Turner ¶ 8; Aff. Wiggins ¶¶ 8, 15; Aff. Wright ¶¶ 4, 10; Aff. Goldman ¶ 12; Aff. ODell ¶ 7.)[3]

18. Prior to accepting an IMA Plaintiff's funds for investment, Heafner required the IMA Plaintiff to review and execute several documents. (Aff. Howell ¶ 10; Aff. Kea Hrvatin ¶ 10; Aff. Scott Hrvatin ¶ 9; Aff. Rapp ¶ 12; Aff. Shrader ¶¶ 17, 22; Aff. Turner ¶ 9; Aff. Wiggins ¶¶ 9, 15; Aff. Wright ¶¶ 5, 10; Aff. Goldman ¶ 13; Aff. ODell ¶ 12.)

19. Among these documents was an Investment Management Agreement ("IMA") between FFI and each IMA Plaintiff. (Aff. Braun Exs. A–I.)[4]

20. Included in each IMA is a clause providing for "Binding Arbitration":

> Client and FFI each agree that, except as prohibited by applicable law, all claims or controversies, and any related issues, which may arise any time between the Parties (including FFI's representatives, directors, officers, employees, and agents) concerning any investment or planning advice, recommendation, or exercise of limited discretionary authority with respect to any subject matter; any transaction or order; the conduct of FFI or its representatives, directors, officers, employees, and agents; the construction, performance, or breach of this or any other agreement

---

[3] Shrader argues that her IMA was not supported by consideration because she did not open an FFI account. (*See* IMA Pls.' Opp'n Corporate Defs. Mot. Dismiss or, Alternative, Stay & Compel Arb'n 31 [hereinafter "Pls.' Br. Opp'n"], ECF No. 34.) The Court finds this argument without merit because the undisputed evidence shows that Shrader acquired the right to fund an FFI account—a legal benefit—by entering into the IMA.

[4] There are two versions of the IMA—one version signed by Howell, Kea Hrvatin, Scott Hrvatin, Rapp, Turner, Goldman, and ODell and a second version signed by Shrader, Wiggins, and Wright, (*compare, e.g.*, Aff. Braun Ex. A *to* Ex. D). The provisions at issue, described below, are identical in both versions.

between the Parties, whether entered into prior to, on, or subsequent to the date of this Agreement; the breach of any common law or statutory duty; or the violation of any federal or state law of any nature shall be resolved by binding arbitration rather than by a lawsuit in a court of law or equity.

(Aff. Braun Ex. A ¶ 14(b); Ex. B ¶ 14(b); Ex. C ¶ 14(b); Ex. D ¶ 19(b); Ex. E ¶ 14(b); Ex. F ¶ 19(b); Ex. G ¶ 19(b); Ex. H ¶ 14(b); Ex. I ¶ 14(b).)

21.     The arbitration clause further provides that "[a]ny arbitration pursuant to this Agreement shall be in accordance with, and governed by, the Code of Commercial Arbitration of the American Arbitration Association"[5] and that "[a]ny arbitration shall be held in the County of Kent, State of Michigan."  (Aff. Braun Ex. A ¶ 14(c); Ex. B ¶ 14(c); Ex. C ¶ 14(c); Ex. D ¶ 19(c); Ex. E ¶ 14(c); Ex. F ¶ 19(c); Ex. G ¶ 19(c); Ex. H ¶ 14(c); Ex. I ¶ 14(c).)

22.     The arbitration provision also states, in relevant part, that (i) "[a]rbitration shall be final and binding on all parties[,]" (ii) "[t]he parties are each waiving their right to seek remedies in court, including the right to a jury trial[,]" (iii) "[p]re-arbitration discovery is generally more limited than, and different from, court proceedings[,]" (iv) "[t]he arbitrator's award is not required to include factual findings or legal reasoning[,]" (v) "any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited[,]" (vi) "[t]he panel of arbitrators may include a minority of arbitrators who were or are affiliated with the securities industry[,]" and

---

[5] The parties do not dispute that the IMAs' reference to the "Code of Commercial Arbitration of the American Arbitration Association" is a reference to the AAA Commercial Arbitration Rules and Mediation Procedures ("AAA Commercial Rule(s)").  *See Maggio v. Windward Capital Mgmt. Co.*, 96 Cal. Rptr. 2d 168, 170 (Cal. Ct. App. 2000) (concluding that an arbitration clause invoking the Code of Commercial Arbitration of the American Arbitration Association invoked the AAA Commercial Rules).

(vii) "[t]his agreement to arbitrate does not constitute a waiver of the right to seek a judicial forum to the extent that such a waiver would be void under applicable law[.]" (Aff. Braun Ex. A ¶ 14(a); Ex. B ¶ 14(a); Ex. C ¶ 14(a); Ex. D ¶ 19(a); Ex. E ¶ 14(a); Ex. F ¶ 19(a); Ex. G ¶ 19(a); Ex. H ¶ 14(a); Ex. I ¶ 14(a).)

23. Neither Heafner nor his office staff explained any of the documents to the IMA Plaintiffs and, in particular, did not identify or discuss the IMA's arbitration provision. In addition, many IMA Plaintiffs were not provided copies of the documents they signed, although the Corporate Defendants have provided copies of each signed IMA in support of their Motion. (Aff. Howell ¶¶ 10–11, 13, 19–20; Aff. Kea Hrvatin ¶¶ 11, 13–14, 21; Aff. Scott Hrvatin ¶¶ 9–10, 12, 14, 20; Aff. Rapp ¶¶ 12–13, 28, 36; Aff. Shrader ¶¶ 22, 28; Aff. Turner ¶¶ 9–11, 19; Aff. Wiggins ¶¶ 9, 15, 18–19, 26; Aff. Wright ¶¶ 5, 7, 12, 18; Aff. Goldman ¶¶ 13–14, 21, 27; Aff. ODell ¶¶ 11–13, 20–21.)

24. There is no evidence any IMA Plaintiff invested funds with Heafner or the Corporate Defendants prior to signing an IMA with FFI. (*See* Aff. Howell ¶ 10; Aff. Kea Hrvatin ¶ 10; Aff. Scott Hrvatin ¶ 9; Aff. Rapp ¶ 13; Aff. Shrader ¶ 21; Aff. Turner ¶ 9; Aff. Wiggins ¶ 9; Aff. Wright ¶ 5; Aff. Goldman ¶ 13; Aff. ODell ¶ 9.)

25. Despite Heafner's assurances that the 1 Global MOIs were safe investments, 1 Global mismanaged the funds raised through the MOIs and the MOIs proved to be worthless. Ultimately, the SEC charged 1 Global with fraud and violation of securities laws, and 1 Global filed for bankruptcy protection in July 2018. (Am. Compl. ¶¶ 2, 49, 52, Ex. B.) Heafner has admitted that he recommended 1 Global

MOIs to about forty-five people, including the IMA Plaintiffs, for which he received commissions. (Am. Compl. ¶¶ 71–72, Ex. E.)

26. The IMA Plaintiffs (other than Goldman and ODell) commenced this action on November 5, 2019, alleging (i) a claim against all Defendants for breach of fiduciary duty and liability under the Michigan Uniform Securities Act; (ii) claims against Heafner for breach of duty to exercise reasonable skill, care, and diligence, negligent misrepresentation, and liability under N.C.G.S. § 78A-56(a)(2); and (iii) claims against the Corporate Defendants for vicarious liability, negligent and willful or wanton supervision, negligent and willful or wanton breaches of duty, punitive damages, N.C.G.S. § 78A-56(c)(1) control liability, violations of 15 U.S.C. § 77e(a) and (c), and 15 U.S.C. § 77o(a) Securities Act of 1933 control liability. (Compl., ECF No. 1.) The IMA Plaintiffs later filed an Amended Complaint adding Goldman and ODell as plaintiffs. (*See* Am. Compl.)

27. The Corporate Defendants filed the Motion to Dismiss on January 17, 2020, seeking dismissal of all claims against them for improper venue or, alternatively, to stay the action and compel arbitration on all claims asserted against them. (Defs.' FFI & RWA's Mot. Dismiss or, Alternative, Stay & Compel Arb'n, ECF No. 16.) Heafner answered the Amended Complaint separately on March 2, 2020 and has not joined the Motion to Dismiss. (Def. James H. Heafner's Answer Am. Compl., ECF No. 38.)

28. After the Corporate Defendants filed their reply brief on February 26, 2020, (ECF No. 37), the IMA Plaintiffs filed the Motion to Strike on March 5, 2020, asking

the Court to strike Section I of the reply brief or grant the IMA Plaintiffs leave to file a sur-reply to Sections I and III of the reply brief, (ECF No. 43).

29. After full briefing, the Court heard the Motion to Dismiss and the Motion to Strike on March 10, 2020 (the "Hearing"), at which all parties were represented by counsel.

30. After the Hearing, and in response to a request from the parties, the Court permitted the parties the opportunity to submit both supplemental briefs and supplemental reply briefs on the Motions, (*see* ECF No. 47), the last of which the Court received on June 15, 2020, (*see* ECF Nos. 65, 73–75).

31. The Motions are now ripe for resolution.

III.

CONCLUSIONS OF LAW[6]

A. Applicable Law

32. The North Carolina appellate courts have instructed that "it is incumbent upon a trial court when considering a motion to compel arbitration to 'address whether the Federal Arbitration Act ("FAA") or the North Carolina Revised Uniform Arbitration Act [("NCRUAA")] applies' to any agreement to arbitrate." *King v. Bryant*, 225 N.C. App. 340, 344, 737 S.E.2d 802, 806 (2013) (quoting *Cornelius*, 224 N.C. App. at 18, 734 S.E.2d at 872). "The FAA applies when '(a) a written arbitration agreement exists that covers the dispute and (b) the contract containing the arbitration provision evidences a transaction involving interstate commerce.' "

---

[6] Any determination earlier stated as a finding of fact that should have been stated as a conclusion of law is incorporated into these Conclusions of Law.

*Bergenstock v. Legalzoom.com, Inc.*, 2015 NCBC LEXIS 66, at \*10 (N.C. Super. Ct. June 23, 2015) (quoting *Capps*, 2010 NCBC LEXIS 10, at \*25–26); *see also Am. Home Assurance Co. v. Vecco Concrete Constr. Co.*, 629 F.2d 961, 963 (4th Cir. 1980) (to similar effect).

33. Here, Defendants contend, and the IMA Plaintiffs do not dispute, that the FAA applies to the IMA Plaintiffs' agreements to arbitrate. The Court agrees. The IMA Plaintiffs and Heafner are residents of North Carolina, Heafner performed his services from his Charlotte office, RWA and FFI are business entities organized and operating in Michigan, and the transactions contemplated under the IMAs involve activity in and between North Carolina and Michigan and thus affect interstate commerce, requiring application of the FAA.[7] *See, e.g.*, *Rickenbaugh v. Power Home Solar*, *LLC*, 2019 NCBC LEXIS 109, at \*10 (N.C. Super. Ct. Dec. 20, 2019) (citing *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 278–81 (1995)) (noting that the FAA "requires only that the transaction involve interstate commerce; the parties to the transaction need not " 'contemplate' an interstate commerce connection").

34. The Court notes, however, that "even when the FAA governs a dispute, state law fills procedural gaps in the FAA as it is applied in state courts." *Cold Springs Ventures*, 2014 NCBC LEXIS 10, at \*8; *see also Carter v. TD Ameritrade Holding Corp.*, 218 N.C. App. 222, 226, 721 S.E.2d 256, 260 (2012) (holding the trial court

---

[7] The IMA Plaintiffs' decision not to challenge the application of the FAA provides a separate basis to apply the FAA to the IMAs. *See, e. g.*, *Maxum Founds., Inc. v. Salus Corp.*, 779 F.2d 974, 978 n.4 (4th Cir. 1985) (applying the FAA where "the party seeking arbitration alleges that the transaction is within the scope of the Act" and there is no effort "to rebut jurisdiction under the federal statute").

properly considered motion to compel arbitration under N.C.G.S. § 1-569.7 in a matter governed by FAA); *Gaylor, Inc. v. Vizor, LLC*, 2015 NCBC LEXIS 102, at *12 (N.C. Super. Ct. Oct. 30, 2015) (holding that North Carolina law fills procedural gaps in the FAA, "including where claims might otherwise be governed by sections 3 and 4 of the FAA").

35. In that regard, N.C.G.S. § 1-569.7(a) provides that "[o]n motion of a person showing an agreement to arbitrate and alleging another person's refusal to arbitrate pursuant to the agreement: . . . (2) If the refusing party opposes the motion, the court shall proceed summarily to decide the issue[.]"). Because N.C.G.S. § 1-569.7(a)(2) describes the situation here, the Court "shall [therefore] decide the issue and order the parties to arbitrate unless it finds that there is no enforceable agreement to arbitrate." N.C.G.S. § 1-569.7(a)(2).

B. Arbitrability

36. Under the FAA, "[d]isputes over arbitrability require a two-step inquiry: 'First, [courts] determine who decides whether a particular dispute is arbitrable: the arbitrator or the court. Second, if [the court] concludes that the court is the proper forum in which to adjudicate arbitrability, [the court] then decides whether the dispute is, in fact, arbitrable.'" *Rickenbaugh*, 2019 NCBC LEXIS 109, at *10 (quoting *Gaylor*, 2015 NCBC LEXIS 102, at *14).

37. "[C]ourts presume that the parties intend courts, not arbitrators, to decide what . . . have [been] called disputes about 'arbitrability.' These include questions such as 'whether the parties are bound by a given arbitration clause[.]'" *BG Grp.*

*PLC v. Republic of Arg.*, 572 U.S. 25, 34 (2014) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)).[8] That said, "parties can, and often do, delegate arbitrability to the arbitrator." *Charlotte Student Hous. DST v. Choate Constr. Co.*, 2018 NCBC LEXIS 88, at *8 (N.C. Super. Ct. Aug. 24, 2018). Nevertheless, "[u]nless the parties *clearly and unmistakably* provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986) (emphasis added); *see also Bailey v. Ford Motor Company*, 244 N.C. App. 346, 352–53, 780 S.E.2d 920, 925 ("A party can overcome this presumption if it shows that the parties 'clearly and unmistakably' intended for an arbitrator, instead of a court, to decide issues of substantive arbitrability.").

38. "Under the FAA, 'the parties' express adoption of an arbitral body's rules in their agreement, which delegate questions of substantive arbitrability to the arbitrator, presents clear and unmistakable evidence that the parties intended to arbitrate questions of substantive arbitrability.' " *Rickenbaugh*, 2019 NCBC LEXIS 109, at *12 (quoting *Bailey*, 244 N.C. App. at 353, 780 S.E.2d at 926); *see also AP Atl., Inc. v. Crescent Univ. City Venture, LLC*, 2016 NCBC LEXIS 60, at *16 (N.C. Super.

---

[8] In determining whether a court or an arbitrator is to decide a dispute about arbitrability, courts frequently "distinguish between issues of procedural arbitrability, on the one hand, and issues of substantive arbitrability, on the other hand." *Local Soc., Inc. v. Stallings*, 2017 NCBC LEXIS 94, at *14 (N.C. Super. Ct. Oct. 9, 2017). "[Q]uestions such as 'whether the parties are bound by a given arbitration clause,' or 'whether an arbitration clause in a concededly binding contract applies to a particular type of controversy' " are those of "substantive arbitrability." *Bailey*, 244 N.C. App. at 351–52, 780 S.E.2d at 925 (quoting *BG Grp. PLC*, 572 U.S. at 34). Hence, the issue presented here is one of substantive arbitrability. There is a presumption that "issues of substantive arbitrability . . . are for a court to decide[.]" *Howsam*, 537 U.S. at 85.

Ct. July 28, 2016) ("[B]y incorporating [AAA] Rules, 'the parties agreed the arbitrator should decide issues of substantive arbitrability.' " (quoting *Epic Games, Inc. v. Murphy-Johnson*, 247 N.C. App. 54, 63–64, 785 S.E.2d 137, 144 (2016))).

39. Here, the Court agrees with the Corporate Defendants that the parties, through the IMAs, agreed that they would arbitrate questions of substantive arbitrability. Each IMA at issue provides that "[a]ny arbitration pursuant to this Agreement, shall be in accordance with, and governed by, the Code of Commercial Arbitration of the American Arbitration Association[,]" (Aff. Braun Ex. A ¶ 14(c); Ex. B ¶ 14(c); Ex. C ¶ 14(c); Ex. D ¶ 19(c); Ex. E ¶ 14(c); Ex. F ¶ 19(c); Ex. G ¶ 19(c); Ex. H ¶ 14(c); Ex. I ¶ 14(c)), thereby incorporating the AAA Commercial Rules.

40. Because Rule 7(a) of the AAA Commercial Rules provides that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the *arbitrability of any claim or counterclaim*[,]" AAA Commercial Arbitration Rules & Mediation Procedures, Rule 7(a) (emphasis added), the Court concludes that the IMA Plaintiffs and the Corporate Defendants clearly and unmistakably delegated issues of arbitrability to the arbitrator. *See, e.g.*, *United States ex rel. Beauchamp & Shepherd v. Academi Training Ctr.*, Case No. 1:11cv371, 2013 U.S. Dist. LEXIS 46433, at *15 (E.D. Va. Mar. 29, 2013) (listing cases and holding that an agreement to arbitrate under the AAA Commercial Rules " 'clearly and unmistakably' delegates to the arbitrator the question of arbitrability [under Rule 7] and thus, the . . . arbitration clause, by referencing the AAA Commercial Rules, 'clearly and

unmistakably' does the same"); *Gaylor*, 2015 NCBC LEXIS 102, at \*18 ("The Court finds persuasive the Virginia federal district court's reasoning in *Beauchamp & Shepherd* . . . and similarly concludes that [a rule identical to Rule 7 of the AAA Commercial Rules] 'clearly and unmistakably' submits the issue of . . . arbitrability . . . to the arbitrator."); *see also, e.g.*, *Epic Games*, 247 N.C. App. at 63, 785 S.E.2d at 144 ("[U]nder the FAA, an arbitration clause which incorporated an arbitral body's rules, when those rules *explicitly delegate the threshold issue of arbitrability* to an arbitrator, constitutes 'clear and unmistakable' evidence[.]" (emphasis added)).

41.     Nevertheless, "[f]inding clear and unmistakable delegation, however, does not end the inquiry. . . .  [T]he Court must also determine whether plaintiff specifically challenges the enforceability of the delegation clauses.  If so, the Court 'must consider the challenge' under the relevant state law."  *McCoy v. Dave & Buster's, Inc.*, No. 15-CV-0465 (JFB) (AYS), 2018 U.S. Dist. LEXIS 16655, at \*19 (E.D.N.Y. Jan. 24, 2018) (quoting *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 71 (2010)); *see also, e.g.*, *Davis v. BSH Home Appliances Corp.*, No. 4:15-CV-103-FL, 2016 U.S. Dist. LEXIS 16321, at \*7 (E.D.N.C. Feb. 10, 2016) ("When an arbitration agreement containing a valid delegation clause is challenged, the validity of the arbitration agreement itself is a matter for the arbitrator. . . .  [But] a party may challenge the validity of a delegation clause in court[.]" (citation omitted)); *Barker v. Fox Den Acres, Inc. (In re Barker)*, 510 B.R. 771, 777 (Bankr. W.D.N.C. 2014) ("Where, as here, the agreement to arbitrate includes a delegation clause, which delegates disputes about arbitrability to the arbitrator, the delegation clause must be enforced

unless there is a specific challenge to the delegation clause that is separate and distinct from a challenge to the agreement to arbitrate overall.").

42. The IMA Plaintiffs contend that the arbitration clause was induced by fraud and that enforceability of the IMA in these circumstances is to be decided by the Court. (*See* Pls.' Br. Opp'n 21–27.) The IMA Plaintiffs rely on the United States Supreme Court's decision in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04 (1967), a decision cited in *King v. Bryant*, 369 N.C. 451, 795 S.E.2d 340 (2017), a decision of the Supreme Court of North Carolina. (Pls.' Br. Opp'n 22.) In *Prima Paint*, the United States Supreme Court held that "if the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the 'making' of the agreement to arbitrate—the . . . court may proceed to adjudicate it." 388 U.S. at 403–04.[9] Relying on this principle, the IMA Plaintiffs argue that the Court should decide the issue of arbitrability and determine the IMA Plaintiffs' fraud-based defense to enforcement. (*See* Pls.' Br. Opp'n 24–27.)

43. Subsequent decisions of the United States Supreme Court, however, have narrowed *Prima Paint*'s reach. First, the Supreme Court decided in *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445–46 (2006), that the trial court is to decide arbitrability, despite clear and unmistakable evidence that the parties agreed

---

[9] Similarly, the Supreme Court of North Carolina held in *King*, 369 N.C. at 467 n.5, 795 S.E.2d at 351 n.5, that "a breach of fiduciary duty 'constitutes fraud,'" (quoting *Link v. Link*, 278 N.C. 181, 192, 179 S.E.2d 697, 704 (1971)), and that "arbitration agreements are subject to invalidation based upon 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue[,]" *id.* at 467–68, 795 S.E.2d at 351 (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011))).

for the arbitrator to make that decision, only if the party seeking to avoid arbitration challenges the enforceability of the arbitration clause itself, rather than the arbitration agreement as a whole. Later, in *Rent-A-Center*, 561 U.S. at 72, the Supreme Court took this principle a step further, holding that "unless . . . the delegation provision [is challenged] specifically, we must treat it as valid . . . and must enforce it . . . , leaving any challenge to the validity of the Agreement as a whole for the arbitrator." *See also Brennan v. Opus Bank*, 796 F.3d 1125, 1133 (9th Cir. 2015) ("[S]ince [Plaintiff] failed to make any arguments specific to the delegation provision and instead argued that the [Arbitration Clause] *as a whole* is unconscionable under state law, we need not consider that claim because it is for the arbitrator to decide[.]" (citations and internal quotation marks omitted)).

44. Based on its review of the IMA Plaintiffs' briefs, the Court concludes that the IMA Plaintiffs have challenged the delegation clause within the IMAs as well as the arbitration provision as a whole:

> [T]he Plaintiffs challenge the IMAs' arbitration provision, and *anything construed as a delegation clause therein*, because Plaintiffs were . . . fraudulently induced to agree to clauses [that] apply to any claims (a) against Heafner or RWA, (b) against FFI for Heafner's or RWA's conduct, or (c) against FFI for products other than managed trading accounts provided by FFI.

(Pls.' Br. Opp'n 28 (emphasis added).) Even though the IMA Plaintiffs challenge the delegation clause on the same grounds as the arbitration provision as a whole, they have nonetheless made a *distinct* challenge to the provision's delegation clause. *See, e.g.*, *Gibbs v. Haynes Invs., LLC*, 2020 U.S. App. LEXIS 22736, at *12 (4th Cir. July 21, 2020) ("[I]n specifically challenging a delegation clause, a party may rely on the

same arguments that it employs to contest the enforceability of other arbitration provisions." (quoting *MacDonald v. CashCall, Inc.*, 883 F.3d 220, 226–27 (3d Cir. 2018))); *see also, e.g., Parm v. Nat'l Bank of Cal., N.A.*, 835 F.3d 1331, 1335 n.1 (11th Cir. 2016) ("Because [the plaintiff] directly challenged the delegation clause in her opposition to the motion to compel, there is no waiver and we have jurisdiction to consider [her] challenge.").

45. Having thus concluded that the delegation clause has been specifically challenged, the issue of enforceability of the delegation provision is one for the Court. *See, e.g., Minnieland Private Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co.*, 867 F.3d 449, 455 (4th Cir. 2017) (holding that since the plaintiff "specifically challenged the enforceability of the delegation provision, [the court] then must decide whether the delegation provision is unenforceable 'upon such grounds as exist at law or in equity' " (quoting 9 U.S.C. § 2)); *see also, e.g., Davis*, 2016 U.S. Dist. LEXIS 16321, at *10 ("The delegation clause must be a binding contract before the court can order the parties to arbitrate the validity and scope of the Arbitration Agreement.").

C.    Enforceability of the Delegation Clause

46. "Although both federal and North Carolina law favor the enforcement of arbitration provisions, each requires the existence of a valid agreement to arbitrate." *Cold Springs Ventures*, 2014 NCBC LEXIS 10, at *8; *see also Brown v. Centex Homes*, 171 N.C. App. 741, 744, 615 S.E.2d 86, 88 (2005) ("[B]efore a dispute can be ordered resolved through arbitration, there must be a valid agreement to arbitrate.").

47. "When deciding whether the parties agreed to arbitrate a certain matter . . . , courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *see also Senior Mgmt., Inc. v. Capps*, 240 F. App'x 550, 552–53 (4th Cir. 2007) ("The issue of whether an arbitration agreement exists between the parties, however, is a question of state contract law. Thus, state law determines questions 'concerning the validity, revocability, or enforceability of contracts generally.' " (citations omitted) (quoting *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987))). "The party seeking to compel arbitration has the burden of proving that a valid arbitration agreement exists by mutual agreement of both parties." *Bergenstock*, 2015 NCBC LEXIS 66, at *9 (citing *Slaughter v. Swicegood*, 162 N.C. App. 457, 461, 591 S.E.2d 577, 580 (2004)).

48. Where, as here, "the opposing party denies the existence of an agreement to arbitrate, the court must summarily decide the issue of the existence of an agreement to arbitrate[.]" *Bluffs, Inc. v. Wysocki*, 68 N.C. App. 284, 285, 314 S.E.2d 291, 292 (1984); *see also Burke v. Wilkins*, 131 N.C. App. 687, 689, 507 S.E.2d 913, 914 (1998) ("[W]hen a party disputes the existence of a valid arbitration agreement, [North Carolina law] expressly requires the trial judge 'to summarily determine whether, as a matter of law, a valid arbitration agreement exists,' and failure to comply with this mandate is reversible error." (quoting *Routh v. Snap-On Tools Corp.*, 101 N.C. App. 703, 706, 400 S.E.2d 755, 757 (1991))).

49.     The Court thus turns to this summary determination, which distilled, focuses on whether the Supreme Court of North Carolina's decision in *King* renders the IMAs at issue invalid and unenforceable. The IMA Plaintiffs contend it does, arguing that *King* shows that the Corporate Defendants had a fiduciary duty to the IMA Plaintiffs that required them to disclose material information about the arbitration agreements before the IMA Plaintiffs signed them. This, the IMA Plaintiffs contend, the Corporate Defendants failed to do. (Pls.' Br. Opp'n 21–27.) In response, the Corporate Defendants argue that *King* involved very different facts and relationships and has no application to the facts of this case. (FFI & RWA's Reply Br. Supp. Mot. Dismiss or, Alternative, Stay & Compel Arb'n 5–11 [hereinafter "Reply Br."], ECF No. 37.)

50.     Our Supreme Court recognized in *King* that when an "arbitration agreement [is] obtained as the result of a breach of fiduciary duty from which defendants benefitted[, it] is, for that reason, unenforceable." 369 N.C. at 469, 795 S.E.2d at 352. The Supreme Court also stated that

> we would have reached the same result on these facts with respect to any agreement that substantially affected Mr. King's substantive legal rights, such as an agreement absolving defendants from the necessity for compliance with otherwise applicable confidentiality requirements, providing for the transfer of items of real or personal property from Mr. King to defendants, or waiving any tort or contract-based claims that Mr. King might have had against either or both defendants.

*Id.* at 468, 795 S.E.2d at 351. Therefore, the Court must now determine whether there was a breach of fiduciary duty by the Corporate Defendants that renders the arbitration provisions in the IMAs unenforceable against the IMA Plaintiffs.

D.    Breach of Fiduciary Duty

51.    "For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties." *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001). "North Carolina recognizes two types of fiduciary relationships: *de jure*, or those imposed by operation of law, and *de facto*, or those arising from the particular facts and circumstances constituting and surrounding the relationship." *Hager v. Smithfield E. Health Holdings, LLC*, 826 S.E.2d 567, 571 (N.C. Ct. App. 2019), *disc. review denied*, 373 N.C. 253 (2019).

52.    "A number of relationships have been held to be inherently fiduciary, including the relationships between spouses, attorney and client, trustee and beneficiary, members of a partnership, and physician and patient." *King*, 369 N.C. at 464, 795 S.E.2d at 349 (citations omitted); *see also Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 367, 760 S.E.2d 263, 266 (2014) ("Common to all these relationships is a heightened level of trust and the duty of the fiduciary to act in the best interests of the other party."). "The list of relationships that [the Supreme Court of North Carolina] ha[s] held to be fiduciary in their very nature is a limited one[.]" *CommScope Credit Union v. Butler & Burke, LLP*, 369 N.C. 48, 52, 790 S.E.2d 657, 660 (2016).

53.    The IMA Plaintiffs argue that they had a *de jure* fiduciary relationship with the Corporate Defendants based on certain provisions of the North Carolina Investment Advisers Act. (IMA Pls.' Suppl. Initial Br. Opposing FFI & RWA's Mot.

Compel Arb'n 5–14, ECF No. 73). In particular, the IMA Plaintiffs focus on N.C.G.S. § 78C-8(a), which provides:

> It is unlawful for any person who receives, directly or indirectly, any consideration from another person for advising the other person as to the value of securities or their purchase or sale, . . . [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon the other person[.]"

54. Although the IMA Plaintiffs engage in a lengthy analysis of various statutes and cases to argue that investment advisors have a *de jure* fiduciary relationship with their clients, the IMA Plaintiffs fail to confront this Court's prior decisions to the contrary. *See, e.g.*, *Edwards v. Mutter*, 2019 NCBC LEXIS 111, at *10 (N.C. Super. Ct. Dec. 17, 2019) ("North Carolina law has not recognized an investment advisor-client relationship as a *de jure* fiduciary relationship."); *Silverdeer, LLC v. Berton*, 2013 NCBC LEXIS 21, at *27 (N.C. Super. Ct. Apr. 24, 2013) (holding that "[t]he mere assertion of an investment advisor-client relationship or reliance upon [N.C.]G.S. 78C *et seq.* does not give rise to a *de jure* fiduciary relationship"). And our appellate courts have made clear that "to create a *de jure* fiduciary relationship on the basis of special knowledge and skill alone would greatly expand the 'limited' list that our Supreme Court has 'not add[ed] to . . . lightly.'" *Hager*, 826 S.E.2d at 572 (quoting *CommScope*, 369 N.C. at 52, 790 S.E.2d at 660). In light of this persuasive precedent, the Court declines to find a *de jure* fiduciary relationship between the IMA Plaintiffs and the Corporate Defendants under North Carolina law, particularly before the IMA Plaintiffs entered into the IMAs and entrusted their funds to Defendants, and does

not believe the Supreme Court of North Carolina would conclude to the contrary if the issue were before it for decision.

55. The Court next turns to whether these parties were in a *de facto* fiduciary relationship prior to their entry into the IMAs and entrustment of funds to Heafner. Our courts have recognized that "[a] confidential or fiduciary relation can exist under a variety of circumstances and is not limited to those persons who also stand in some recognized legal relationship to each other[.]" *Stilwell v. Walden*, 70 N.C. App. 543, 546, 320 S.E.2d 329, 331 (1984); *see also Austin v. Regal Inv. Advisors, LLC*, 2018 NCBC LEXIS 3, at *18 (N.C. Super. Ct. Jan. 8, 2018) ("[F]iduciary relationships 'can arise in a variety of circumstances, and may stem from varied and unpredictable facts.'" (quoting *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 588, 403 S.E.2d 483, 489 (1991))). "Generally, the existence of a [*de facto* fiduciary relationship] is determined by specific facts and circumstances[.]" *Hewitt v. Hewitt*, 252 N.C. App. 437, 443, 798 S.E.2d 796, 800 (2017) (quoting *Stamm v. Salomon*, 144 N.C. App. 672, 680, 551 S.E.2d 152, 158 (2001)); *see also Highland Paving Co. v. First Bank*, 227 N.C. App. 36, 42, 742 S.E.2d 287, 292 (2013) ("Determining whether a fiduciary relationship exists requires looking at the particular facts and circumstances of a given case." (quoting *Crumley & Assocs., P.C. v. Charles Peed & Assocs., P.A.*, 219 N.C. App. 615, 621, 730 S.E.2d 763, 767 (2012))).

56. Our Supreme Court has long held that "a fiduciary relation is said to exist [w]herever confidence on one side results in superiority and influence on the other side; where a special confidence is reposed in one who in equity and good conscience

is bound to act in good faith and with due regard to the interests of the one reposing the confidence." *Vail v. Vail*, 233 N.C. 109, 114, 63 S.E.2d 202, 206 (1951) (citation and internal quotation marks omitted). "Only when one party figuratively *holds all the cards*—all the financial power or technical information, for example—have North Carolina courts found that the special circumstance of a fiduciary relationship has arisen." *Lockerman v. S. River Elec. Mbrshp. Corp.*, 250 N.C. App. 631, 636, 794 S.E.2d 346, 352 (2016) (emphasis added) (quoting *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 613, 659 S.E.2d 442, 451 (2008)).

57. "Liability for breach of fiduciary duty 'is based on [the taking advantage of] a confidential relationship rather than a specific misrepresentation.'" *King*, 369 N.C. at 465, 795 S.E.2d at 349 (quoting *Barger v. McCoy Hillard Parks*, 346 N.C. 650, 666, 488 S.E.2d 215, 224 (1997)); *see also Priddy v. Kernersville Lumber Co.*, 258 N.C. 653, 658, 129 S.E.2d 256, 261 (1963) (holding liability for a breach of fiduciary duty "may exist without any fraudulent intent"). "Where a relation of trust and confidence exists between the parties, there is a duty to disclose all material facts, and failure to do so constitutes [a breach of that duty]." *Vail*, 233 N.C. at 114, 63 S.E.2d at 206 (citation and internal quotation marks omitted).

58. The parties have identified, and the Court's research has revealed, only two North Carolina cases that have addressed a breach of fiduciary duty defense to the enforcement of an arbitration agreement: the Supreme Court's decision in *King* and the Court of Appeals' decision in *Hager*. Both are relevant to the Court's review of the delegation clause at issue here and will be addressed in turn.

59. In *King*, the plaintiff, King, was referred to a surgeon by his primary care physician, with whom King had a *de jure* fiduciary relationship, to treat an acute medical condition. 369 N.C. at 455–56, 795 S.E.2d at 344. Before meeting with the surgeon, King was asked to provide confidential medical information and sign several documents, including a "poorly drafted, confusing, and nonsensical" arbitration agreement. *Id.* at 456, 795 S.E.2d at 344. King signed the arbitration agreement without understanding the consequences, in part due to the fact he did not have a post-high school education and had limited exposure to legal documents. *Id.* at 453, 455, 795 S.E.2d at 343–44. The arbitration agreement did not explain what arbitration was or state that the patient was waiving constitutional rights to a jury trial. *Id.* at 456, 795 S.E.2d at 344. There was no evidence that anyone disclosed to King "that the [a]greement sought to foreclose his access to the judicial process in the event that any dispute arose out of or related to the surgery to be performed by Defendant[.]" *Id.* Finally, the agreement was presented with other documents, as if it was being obscured. *Id.* at 458, 795 S.E.2d at 345.

60. In light of this evidence, the Supreme Court held that "[i]t is difficult for us to see how one could reach any conclusion other than that Mr. King reposed trust and confidence in [the surgeon], to whom he had been referred by his family physician for the purpose of receiving surgical treatment[,]" and "that a fiduciary relationship existed between Mr. King and [the surgeon] at the time that Mr. King signed the arbitration agreement." *Id.* at 466, 795 S.E.2d at 350. The Supreme Court also held the defendants breached the fiduciary duty they owed to King:

> Instead of specifically bringing this agreement, which substantially affected his legal rights in the event that an untoward event occurred during the course of the treatment that he received from defendants, to Mr. King's attention and explaining it to him, defendants presented Mr. King with the arbitration agreement, which, at a minimum, could have been worded more clearly, in a collection of documents, thereby creating the understandable impression that the arbitration agreement was simply another routine document that Mr. King needed to sign in order to become a patient.

*Id.*

61. In contrast, in *Hager*, the plaintiff, Hager, was referred to a nursing home facility by her chiropractor's office because her father needed such services. 826 S.E.2d at 569. The chiropractor had never treated her father and had no personal knowledge of his condition, so he did not owe Hager's father a fiduciary duty. *Id.* at 573–74. Before signing the arbitration agreement presented by the nursing home, Hager was allowed to tour the facility and ask questions about the kind of care that would be provided. *Id.* at 573. Additionally, Hager was able to assess the facility with a friend "who also had the opportunity to offer her independent thoughts concerning the facility" before Hager signed any documents on behalf of her father. *Id.*

62. On these facts, the Court of Appeals concluded that Hager's provision of confidential information to the defendant nursing home and her lack of legal expertise were insufficient, taken together, to create a *de facto* fiduciary duty between the facility and Hager's father. *Id.* at 574. The Court reasoned that not only did Hager have the opportunity to perform due diligence on the facility before providing any confidential information, but the arbitration agreement she signed, unlike the

agreement in *King,* "outlined the nature of arbitration, identified the rights [Hager's father] was relinquishing, and encouraged Ms. Hager to seek the advice of legal counsel before signing." *Id.* On this record, the Court of Appeals held that a fiduciary relationship did not exist between Hager's father and the nursing home prior to signing the arbitration agreement. *Id.*

63. The IMA Plaintiffs argue here that Defendants, including the Corporate Defendants, had a fiduciary relationship with the IMA Plaintiffs prior to the execution of the IMAs and the commitment of investor funds because (i) the IMA Plaintiffs reposed special trust and confidence in each Defendant even before entering the IMAs, (ii) Heafner and the Corporate Defendants separately made public announcements that they acted as fiduciaries, and (iii) the IMA Plaintiffs provided confidential life and financial information to the Corporate Defendants in seeking the Corporate Defendants' assistance prior to entering the IMAs and investing their funds based on Heafner's recommendations. (Pls.' Br. Opp'n 24.)

64. The Corporate Defendants argue in opposition that at the point the IMA Plaintiffs signed the arbitration agreements, no fiduciary relationship existed between the IMA Plaintiffs and either Corporate Defendant. (Reply Br. 5–11.) They contend instead that the parties were only "potentially contracting parties" prior to any IMA Plaintiffs' actual investment of money, (Reply Br. 6), and that Heafner (and in turn, the Corporate Defendants) did not "figuratively hold all the cards" in the incipient relationship with each IMA Plaintiff, (Reply Br. 7–9). As a result, the Corporate Defendants argue that this case more closely resembles *Hager*, not *King*,

and that the factors found to create a fiduciary duty in *King* are not present here. (Reply Br. 9–10.)

65. While asserting an investment advisor-client relationship, without more, does not create a fiduciary duty between the parties, *Silverdeer*, 2013 NCBC LEXIS 21, at \*27, North Carolina courts have found that the relationship between an unsophisticated investor and a financial advisor can be a fiduciary one depending on the circumstances, *see, e.g.*, *Beam v. Sunset Fin. Servs., Inc.*, 2019 NCBC LEXIS 56, at \*11 (N.C. Super. Ct. Sept. 3, 2019) (finding *de facto* fiduciary relationship where plaintiffs "were an elderly couple who lacked financial sophistication and who not only came to trust [defendant] as their investment adviser, but also 'involved [defendant] in virtually every aspect of their lives' " (citations omitted)); *Edwards*, 2018 NCBC LEXIS 237, at \*20–21 (finding *de facto* fiduciary relationship where plaintiff "relied upon [defendant's] 'reputation as a safe, secure investment company[,]' that [defendant] 'knew or should have known that [p]laintiff was placing his trust and confidence in [defendant] to look out for the best interests of [p]laintiff[,]' and that [defendant's] very name, 'including the words "fiduciary" and "trust" . . . create[d] a reasonable belief on the part of [p]laintiff that [defendant] stands in a fiduciary relationship with [p]laintiff[.]' " (citations omitted)); *Austin*, 2018 NCBC LEXIS 3, at \*20–21 (finding *de facto* fiduciary relationship where plaintiffs were unsophisticated investors who "relied on [defendants] for their financial expertise to manage their investment accounts").

66.    None of these cases, however, involved, as here, a fiduciary relationship that is alleged to have formed *before* the investor signed account documents and entrusted funds to the advisor for investment.  Indeed, the parties have not offered, and the Court's research has not revealed, any North Carolina decision that does.

67.    Turning then to *King*, the Supreme Court held there that a fiduciary relationship was formed between a patient and his surgeon *before* any services were provided.  369 N.C. at 466, 795 S.E.2d at 350.  As summarized in *Hager*:

> the patient: (1) was referred to the surgeon by his primary care physician, who already had a *de jure* fiduciary duty to the patient; (2) sought out the surgeon for his specialized skill and knowledge; (3) provided the surgeon with confidential medical information on arrival and prior to being seen; and (4) "had received a limited education and had little to no experience interpreting legal documents."

826 S.E.2d at 573 (quoting *King*, 369 N.C. at 466, 796 S.E.2d at 350).  Similarly here, the IMA Plaintiffs offer evidence that each (i) sought out Heafner because of his specialized skill and knowledge as an investment advisor, particularly for retirees, (ii) provided confidential information about the IMA Plaintiff's life and financial situation to Heafner prior to receiving his investment advice, and (iii) had limited experience with legal documents at the time the IMA Plaintiff signed the IMA.

68.    Other facts of record, however, are very different from those in *King* and weigh heavily against finding a fiduciary relationship between the IMA Plaintiffs and the Corporate Defendants prior to the IMA Plaintiffs' individual decisions to contract and invest funds with Heafner and the Corporate Defendants.

69.    First, in *King*, the Supreme Court found the referral to the surgeon by plaintiff's trusted family physician highly significant: "[I]t is difficult for us to see how

one could reach any conclusion other than that Mr. King reposed trust and confidence in [the surgeon], to whom he had been referred by his family physician for the purpose of receiving surgical treatment." 369 N.C. at 466, 795 S.E.2d at 350. In contrast to the plaintiff in *King*, the IMA Plaintiffs sought Heafner out on their own initiative; they were not referred to Heafner by anyone, much less by someone who owed them a fiduciary duty as in *King*. And unlike the plaintiff in *King*, who felt little freedom in selecting a surgeon other than the one referred by his trusted family physician, each IMA Plaintiff had complete freedom to investigate and select the advisor of his or her own choice. Indeed, each reached out to Heafner of their own volition to obtain and assess his investment recommendations, which they were able to compare and contrast to any they may have chosen to receive from other advisors and to accept or reject as each saw fit.

70. Second, the Supreme Court in *King* was appropriately concerned that King was unknowledgeable about medical matters and had limited education. Here, most of the IMA Plaintiffs have post-high school education and the two who do not, Shrader and Wright, were an 18-year bank employee who "helped customers with their bank accounts" and a 42-year Duke Energy "director," respectively. (Aff. Wiggins ¶ 1; Aff. Wright ¶ 2.) While the IMA Plaintiffs offer evidence that they are unsophisticated investors, they have not shown that they were not able to comprehend the straightforward language of the delegation clause and do not contend that the arbitration provision was, as in *King*, "poorly drafted, confusing, and nonsensical." 369 N.C. at 456, 795 S.E.2d at 344. And while they have also suggested that they

may have been hurried or pressed to execute the IMA and related documents without substantive review, they have not shown that they were unable to request and receive more time to consider the paperwork had they chosen to do so, ask questions about the IMAs' various provisions prior to signing, or hold back their signatures until any concerns were satisfied.

71. Third, unlike in *King*, where the arbitration agreement at issue was silent as to the arbitration process and the investor's waiver of his or her right to a jury trial, *id.* at 456, 795 S.E.2d at 344, the IMAs here expressly addressed these points. Indeed, in stark contrast to the arbitration agreement in *King*, the IMA that each IMA Plaintiff signed advised in clear and unambiguous language that, among other things, (i) arbitration was "final and binding," (ii) the IMA Plaintiff was "[waiving [the] right to seek remedies in court, including the right to a jury trial[,]" (iii) "[p]re-arbitration discovery [was] limited," (iv) the "right to appeal [was] strictly limited[,]" and (v) the arbitration panel may include arbitrators "affiliated with the securities industry." (Aff. Braun Ex. A ¶ 14(a); Ex. B ¶ 14(a); Ex. C ¶ 14(a); Ex. D ¶ 19(a); Ex. E ¶ 14(a); Ex. F ¶ 19(a); Ex. G ¶ 19(a); Ex. H ¶ 14(a); Ex. I ¶ 14(a).)

72. The Court finds this case much more like *Hager* than *King*. Like the plaintiff in *Hager*, each IMA Plaintiff had the opportunity to conduct substantial due diligence before retaining Defendants' services. Each IMA Plaintiff met with Heafner (many on multiple occasions), learned about his service offerings, and reviewed his specific proposed investment recommendations before signing an IMA and committing investment funds to his care. (*See* Aff. Howell ¶¶ 4–5, 10; Aff. Kea

Hrvatin ¶¶ 5–7, 10; Aff. Scott Hrvatin ¶¶ 4–6, 9; Aff. Rapp ¶¶ 5–6, 8, 12–13, 17; Aff. Shrader ¶¶ 7–8, 10, 12, 18; Aff. Turner ¶¶ 5–6, 8–9; Aff. Wiggins ¶¶ 6, 9–10; Aff. Wright ¶¶ 3–5, 8; Aff. Goldman ¶¶ 5, 8, 12; Aff. ODell ¶¶ 6, 8.) Unlike the plaintiff in *King*, who needed timely surgery, no IMA Plaintiff has offered evidence that the Plaintiff was required to have an investment advisor or under time pressure to select one. To the contrary, the evidence suggests that each IMA Plaintiff had ample opportunity to ask questions of Heafner and to explore other investment advisor alternatives before electing to entrust Heafner with their savings.

73. Also, the fact that the IMA Plaintiffs provided Heafner confidential financial and other information in these circumstances does not create a fiduciary duty. As the Court of Appeals observed in *Hager*:

> While it is true that the provision of confidential information places confidence in the recipient, that alone does not create a fiduciary duty; for example, people seeking home financing are often required to provide confidential information to lenders, yet those transactions "are considered arm's length and do not typically give rise to fiduciary duties."

826 S.E.2d at 574 (quoting *Dallaire*, 367 N.C. at 368, 760 S.E.2d at 266). The evidence advanced here shows only that the IMA Plaintiffs gave Heafner confidential information so that Heafner could make investment recommendations for their review. The IMA Plaintiffs were free to accept or reject these recommendations and to compare them to any recommendations they were free to obtain from other advisor candidates. There is nothing about the IMA Plaintiffs' interactions that suggest or show that the IMA Plaintiffs engaged in something other than an arm's length transaction with Heafner or that Heafner in any way "held all the cards" in his

incipient relationships with them. Indeed, until the IMA Plaintiffs entrusted their funds to Heafner, they were under no obligation to engage his services and were free to walk away without consequence. Heafner cannot be seen to have exercised domination and influence over them at this stage of the parties' relationship. *See Dalton*, 353 N.C. at 652, 548 S.E.2d at 708 ("No evidence suggests that [the defendant's] position . . . resulted in 'domination and influence on the other [Dalton],' an *essential component of any fiduciary relationship*." (emphasis added)).

74. Finally, the IMA Plaintiffs' lack of legal knowledge does not give rise to a fiduciary relationship either. As in *Hager*, the "lack of legal knowledge does not suffice to show the fiduciary relationship present in *King*, particularly when the" arbitration agreements "outlined the nature of arbitration[ and] identified the rights [being] relinquish[ed.]" *Hager*, 826 S.E.2d at 574. As noted, the IMA Plaintiffs do not contend they could not read or understand the agreements; rather they complain only that no one at Heafner's office told them what the IMAs said about arbitration. *See, e.g.*, *Biesecker v. Biesecker*, 62 N.C. App. 282, 285, 302 S.E.2d 826, 828–29 (1983) ("[A] person signing a written instrument is under a duty to read it for his own protection, and ordinarily is charged with knowledge of its contents. Nor may he predicate an action for fraud on his ignorance of the legal effect of its terms." (citation omitted)).

75. Based on the above, the Court concludes that a *de facto* fiduciary relationship did not exist between the IMA Plaintiffs and the Corporate Defendants before the IMA Plaintiffs signed the IMAs and entrusted their funds to Defendants.

The Court therefore concludes that the IMA Plaintiffs' challenge to the enforceability of the delegation provision must necessarily fail. Having so concluded, the Court shall deny the Motion to Dismiss and order the IMA Plaintiffs' claims against the Corporate Defendants to arbitration. *See, e.g., Heidbreder v. Epic Games, Inc.*, 438 F. Supp. 3d 591, 598 (E.D.N.C. 2020) ("In accordance with the delegation clause, whether the specific claims brought by plaintiff are covered by the scope of the agreement is a question for the arbitrator.").

E.    The Stay

76.    "By statute, the Court must stay proceedings involving one or more claims subject to arbitration. *See* N.C.[G.S.] § 1-569.7(g). If an arbitrable claim is severable from other, non-arbitrable claims in the same action, the Court retains the discretion to limit the stay to the arbitrable claims." *Charlotte Student Hous. DST v. Choate Constr. Co.*, 2019 NCBC LEXIS 21, at *14 (N.C. Super. Ct. Mar. 26, 2019). The Court nonetheless has the authority to stay *all* claims to "promote judicial economy and reduce the potential for inconsistent outcomes." *Id.*

77.    The Court is confronted here with both arbitrable claims (the IMA Plaintiffs' claims against the Corporate Defendants) and non-arbitrable claims (the IMA Plaintiffs' claims against Heafner, who filed an Answer and did not join in the Motion to Dismiss, and the claims of the Non-IMA Plaintiffs, who did not enter into IMAs with Defendants). It is clear to the Court that Plaintiffs' claims, including those by the Non-IMA Plaintiffs, against Defendants arise from the same alleged misconduct—i.e., Heafner's recommendation to each Plaintiff to invest in 1 Global

MOIs. Because litigating this issue both in arbitration and in this action would be unnecessarily duplicative and risk inconsistent determinations, the Court concludes, in the exercise of its discretion, that this action should be stayed pending the outcome of the arbitration between the IMA Plaintiffs and the Corporate Defendants. *See, e.g., id.* (holding that "[a]llowing litigation to proceed . . . while the same disputes are being arbitrated would be duplicative and present a real and substantial risk of inconsistent outcomes"); *see also Apex Tool Grp., LLC v. Ingersoll-Rand Co.*, 2013 NCBC LEXIS 24, at *13–14 (N.C. Super. Ct. May 14, 2013) ("A stay pending arbitration in this action will reduce the likelihood that the arbitration panel and trial court will reach inconsistent determinations[.]").

IV.

MOTION TO STRIKE

78.     The Motion to Strike seeks as alternative relief the opportunity for the IMA Plaintiffs to file a sur-reply to the Motion to Dismiss. The Court permitted both the IMA Plaintiffs and the Corporate Defendants the opportunity to file supplemental briefs and supplemental reply briefs on the Motions without restriction as to topic, (ECF Nos. 65, 73–75), and both chose to file the permitted briefs. As a result, the Court finds that the relief sought by the IMA Plaintiffs in their Motion to Strike has been obtained and thus the Motion to Strike should be denied as moot. *See, e.g., In re Hamilton*, 220 N.C. App. 350, 353, 725 S.E.2d 393, 396 (2012) (noting that an issue is moot whenever "the relief sought has been granted or that the questions originally

in controversy between the parties are no longer at issue" (quoting *In re Peoples*, 296 N.C. 109, 147, 250 S.E.2d 890, 912 (1978))).

## V.

## CONCLUSION

79. **WHEREFORE**, the Court hereby **ORDERS** as follows:

   a. The Motion to Strike is hereby **DENIED**.

   b. The Motion to Dismiss is hereby **DENIED**.

   c. The claims of the IMA Plaintiffs against the Corporate Defendants are hereby **ORDERED** to arbitration.

   d. In the exercise of the Court's discretion, the litigation of all claims in this civil action is hereby **STAYED** pending the outcome of the arbitration proceedings between the IMA Plaintiffs and the Corporate Defendants.

   e. The IMA Plaintiffs and the Corporate Defendants shall submit to the Court a copy of the arbitrator's decision within seven (7) days after the arbitrator has issued his or her decision.

   f. Plaintiffs and Defendants shall meet, confer, and submit a joint status report to the Court reflecting their recommendations concerning further proceedings in this action within fourteen (14) days after the arbitrator has issued his or her decision.

**SO ORDERED**, this the 11th day of September, 2020.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Chief Business Court Judge
